**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>            Plaintiff,<br><br>      v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>            Defendant. | Case No. 25-cv-04426-CKK<br><br>**HEARING REQUESTED** |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

   I.  Factual background ...................................................................................................... 4

     A. The Trump Administration is seeking to exert unprecedented control over our state-run election infrastructure. ..................................................................................................... 4

     B. DOJ is demanding and compiling states' complete, unredacted voter registration lists— including PII—without statutory or constitutional authorization. ....................................... 6

     C. DOJ is reportedly disclosing voter data to DHS to run mass citizenship checks and plans to use the data to enable mass voter purges and challenges. ............................................. 10

     D. DOJ's actions are occurring in the shadow of impending state and federal elections ....... 13

   II. Procedural background ................................................................................................ 14

ARGUMENT ...................................................................................................................... 16

   I.  CREW is likely to succeed on the merits. ................................................................... 16

     A. DOJ has failed to meet the statutory deadline for processing CREW's FOIA requests .... 16

     B. DOJ improperly denied CREW's requests for expedited processing. ............................... 19

       1.  CREW is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(ii). ............... 20

       2.  CREW is separately entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv). ........................................................................................ 24

   II. CREW will be irreparably harmed absent preliminary relief. ..................................... 25

     A. The requested records concern ongoing proceedings of national importance regarding potential violations of federal laws and fundamental rights. ............................................. 27

     B. The requested records concern ongoing proceedings of national importance regarding how DOJ is using the voter data it is amassing. ....................................................................... 29

     C. The requested records concern ongoing proceedings of national importance relating to Americans' data security and privacy. ............................................................................... 30

   III. The balance of equities and public interest favors granting a preliminary injunction ......... 33

CONCLUSION ................................................................................................................... 33

## TABLE OF AUTHORITIES[*]

**Cases**

*Al-Fayed v. CIA*,
254 F.3d 300 (D.C. Cir. 2001) ......................................................21, 23

*American Federation of State, County and Municipal Employees, AFL-CIO v.
SSA*, No. 25-cv-0598, Notice of Corrections to the Record, Dkt. No. 197 (D.
Md. Jan. 16, 2026) ...................................................................31

*Am. Oversight v. U.S. Dep't of State*,
414 F. Supp. 3d 182 (D.D.C. 2019) ...............................................17, 19

*Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*,
498 F. Supp. 3d 87 (D.D.C. 2020) ...........................................21, 23, 26

*California v. Trump*,
--- F. Supp. 3d ----, No. 25-cv-10810-DJC, 2025 WL 2663106 (D. Mass. Sept.
17, 2025) .........................................................................6, 22

*Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*,
711 F.3d 180 (D.C. Cir. 2013) ......................................................17

*Citizens for Responsibility & Ethics in Washington v. DOJ*,
820 F. Supp. 2d 39 (D.D.C. 2011) ...................................................20

*Citizens for Responsibility & Ethics in Washington v. U.S. DOGE Serv.*,
769 F. Supp. 3d 8 (D.D.C. 2025) .........................................2, 20, 23, 24

*Citizens for Responsibility and Ethics in Washington v. DOJ*,
436 F. Supp. 3d 354 (D.D.C. 2020) ...............................................19, 24

*Ctr. for Pub. Integrity v. DOD*,
411 F. Supp. 3d 5 (D.D.C. 2019) ...........................................3, 19, 26, 33

*DOJ v. Reps. Comm. For Freedom of Press*,
489 U.S. 749 (1989) .................................................................28

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
286 F. Supp. 3d 96 (D.D.C. 2017) ...................................................26

*Edmonds v. F.B.I.*,
417 F.3d 1319 (D.C. Cir. 2005) .....................................................19

*Elec. Priv. Info. Ctr. v. DHS*,
218 F. Supp. 3d 27 (D.D.C. 2016) ...................................................17

*Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*,
419 F. Supp. 3d 82 (D.D.C. 2019) ..................................................24

*Elec. Privacy Information Ctr. v. DOJ*,
416 F. Supp. 2d 30 (D.D.C. 2006) ...............................................29, 33

---

[*]Authorities marked with an asterisk are those on which counsel chiefly relies.

## Cases—continued

*In re Extension of Deadlines in Civil Matters Involving the United States*
    *Following Restoration of Appropriations*, Standing Order No. 25-59 (JEB),
    (D.D.C. Nov. 13, 2025) ........................................................................................18

*Leadership Conf. on C.R. v. Gonzales*,
    404 F. Supp. 2d (D.D.C. 2005) ....................................................................22, 23

*League of United Latin Am. Citizens v. Exec. Off. of President*,
    --- F. Supp. 3d ----, No. 25-cv-0946-CKK, 2025 WL 3042704 (D.D.C. Oct.
    31, 2025) ..........................................................................................5, 22, 29

*Multi Ag Media LLC v. Dep't of Agric.*,
    515 F.3d 1224 (D.C. Cir. 2008) .........................................................................30

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) ...........................................................................................23

*Nken v. Holder*,
    556 U.S. 418 (2009) ...........................................................................................16

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978) .............................................................................................1

*Payne Enters. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) .....................................................................23, 26

*Protect Democracy Project, Inc. v. DOD*,
    263 F. Supp. 3d 293 (D.D.C. 2017) ...................................................................24

\**Protect Democracy Project, Inc. v. DOJ*,
    498 F. Supp. 3d 132 (D.D.C. 2020) ............................................................ *passim*

*United States v. State of Oregon*,
    6:25-cv-01666, Minute Order, Dkt. No. 68 (D. Or. Jan. 26, 2026) .........................3

*United States v. Simon*,
    No. 25-cv-03761, Compl., Dkt. No. 1 (Sept. 25, 2025) .........................................10

\**United States v. Weber*,
    No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) .............. *passim*

*Washington Post v. DHS*,
    459 F. Supp. 2d 61 (D.D.C. 2006) ...........................................................3, 22, 26

*Washington v. Trump*,
    --- F. Supp. 3d ----, No. 25-cv00602-JHC, 2026 WL 73866 (W.D. Wash. Jan.
    9, 2026) .......................................................................................................5, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................................16

**Statutes, Rules, and Regulations**

*5 U.S.C.

§ 552(a)(3)(A) ........................................................................................17
§ 552(a)(4)(B) ........................................................................................17
§ 552(a)(6)(A)(i) ...............................................................................18, 19
§ 552(a)(6)(B) ........................................................................................17
§ 552(a)(6)(C)(i) .....................................................................................17
§ 552(a)(6)(E)(iii) ...................................................................................19
§ 552(a)(6)(E)(iii) ...................................................................................20

*5 U.S.C.

§ 552(a)(6)(E)(v)(I) .................................................................................19
§ 552(a)(6)(E)(v)(II) ................................................................................19

31 U.S.C. § 1341(a) .....................................................................................18

52 U.S.C.

§ 20503 .....................................................................................................8
§ 20701 .....................................................................................................8
§ 20901 .....................................................................................................8

*28 C.F.R.

§ 16.5(e)(1)(ii) ........................................................................14, 19, 20, 24
§ 16.5(e)(1)(iv) ..................................................................14, 25, 20, 24, 25
§ 16.5(e)(4) .............................................................................................20

Executive Order 14248, *Preserving and Protecting the Integrity of American Elections,* 90 Fed. Reg. 14005 (Mar. 25, 2025) ........................................4, 5

**Other Authorities**

2026 State Primary Election Dates, National Conference of State Legislatures (last updated Dec. 8, 2025) ........................................................................13, 27

Aaron Pellish, *DOJ sues 6 states for private voter data, voting rolls*, Politico (Sept. 25, 2025) ........................................................................................25

Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025) ....................................12, 31

Assistant Attorney General Harmeet Dhillon (@AAGDhillon), X (Dec. 5, 2025, 1:02 PM) ........................................................................6, 11, 12, 26

Callie Ferguson, *They watched immigration agents in Maine. Then one fired projectiles at their cars, them*, Maine Monitor (Jan. 28, 2026) ..................10

Camilo Montoya-Galvez & Joe Walsh, *Bondi seeks Minnesota voter rolls, welfare data to "help bring back law and order" in wake of shootings*, CBS News (Jan. 25, 2026) ........................................................................................25

*Civil Rights Division, DOJ, Proposed Wisconsin Memorandum of Understanding ........................................................................................1, 7, 31

**Other Authorities—continued**

Comment to DHS by Travis County Clerk, Travis County Tax Assessor-
Collector, and Travis County (Dec. 1, 2025) ........................................................12

*Devlin Barrett & Nick Corsaniti, *Trump Administration Quietly Seeks to Build
National Voter Roll*, NY Times (Sept. 9, 2025) .....................................7, 11, 21, 24

DHS, Privacy Threshold Analysis for the SAVE Program (approved July 17,
2025) ..................................................................................................................10

DHS, Privacy Threshold Analysis for the SAVE Program (approved Sept. 11,
2025) ..................................................................................................................10

E-mail from Scott Laragy, Principle Deputy Director of the Executive Office for
U.S. Att'ys, and Paul Hayden, Senior Counsel at the Dept. of Justice Criminal
Division, to Gregg Amore, Sec'y of State of RI (July 10, 2025) .............................6

E-mail from Scott Laragy, Principle Deputy Director of the Executive Office for
U.S. Att'ys, and Paul Hayden, Senior Counsel at the Dept. of Justice Criminal
Division, to Stephanie Thomas, Sec'y of State of Conn. (July 10, 2025) ................6

*Fontes accuses DOJ of 'blackmail' over Minnesota voter data and ICE removal
offer*, Fox 10 Phoenix (Jan. 25, 2026) ................................................................25

Fredreka Schouten, *Trump's Justice Department seeks voter rolls from Michigan,
a key battleground*, CNN (July 23, 2025) ............................................................24

H.R. Rep. No. 93-1416 (1974) ..............................................................................28

Jeff Wald, *Minneapolis shooting: AG Pam Bondi gives Gov. Walz conditions for
ICE to leave Minnesota*, FOX 9 Minneapolis-St. Paul (Jan. 25, 2026) .............9, 21

Jonathan Shorman, *DOJ is sharing state voter roll lists with Homeland Security*,
Stateline (Sept. 12, 2025) ...................................................................................11

Jude Joffe-Block, *A lawsuit tries to block the Trump administration's efforts to
merge personal data*, NPR (Sept. 30, 2025) ........................................................11

Jude Joffe-Block, *6 facts about false noncitizen voting claims and the election*,
NPR (Nov. 5, 2024) ..............................................................................................5

Jude Joffe-Block, *Trump's SAVE tool is looking for noncitizen voters. But it's
flagging U.S. citizens too*, NPR (Dec. 10, 2025) ..................................................12

*Kaylie Martinez Ochoa, Eileen O'Conner, & Patrick Berry, *Tracker of Justice
Department Requests for Voter Information*, Brennan Ctr. for Just. (last
updated Jan. 16, 2026) ................................................................................. *passim*

Ken Dilanian, *Cybersecurity company finds hacker selling info on 186 million
U.S. voters*, NBC News (Oct. 21, 2020) .............................................................32

Letter from Brittany E. Bennett to Conn. Sec'y of State Stephanie Thomas, Ex. 3
to Mot. for Order to Compel Records Demanded Pursuant to the Civil Rights
Act of 1960, *United States v. Stephanie Thomas*,
26-cv-00021, Dkt. No. 9-4 (D. Conn. Jan. 7, 2026) ............................................29

## Other Authorities—continued

Letter from Harmeet K. Dhillon, Assistant Att'y Gen., to Shenna Bellows, Me.
Sec'y of State (Aug. 18, 2025)......................................................................6

Matt Cohen, *'All-out assault on our democracy:' Bondi's Minnesota 'blackmail'
letter draws righteous fury from state election leaders*, Democracy Docket
(Jan. 27, 2026)..........................................................................................10

Maya Homan, *Raffensperger rebuffs pressure campaign to hand over sensitive
voter data to feds*, Georgia Recorder (Jan. 23, 2026) .............................25

Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early
2024, Report Says*, FedScoop (Oct. 15, 2025).........................................32

Molly Beck, *What to know about the Trump DOJ's quest for Wisconsin voter
data*, Milwaukee Journal Sentinel (Dec. 22, 2025) .................................25

Natalia Contreras & Gabby Birenbaum, *Texas hands over complete list of
registered voters to Trump administration*, The Texas Tribune (Jan. 9, 2026).......................8

Natalia Contreras, *Texas flagged some voters as 'potential noncitizens' but they
had already provided proof of citizenship*, Votebeat (Dec. 18, 2025)....................12

Office of Information Policy Guidance, Calculating FOIA Response Times after
the 2025 Government Shutdown, DOJ Office of Information Policy (Nov. 18,
2025) ........................................................................................................18

*Pam Bondi Offers To Pull ICE out of Minneapolis if Voter Files Handed Over*,
Newsweek (updated Jan. 26, 2026) ..........................................................25

Patrick Marley & Yvonne Wingett Sanchez, *DOJ hits states with broad requests
for voter rolls, election data*, Washington Post (July 16, 2025)...............25

Press Release, DHS, DHS, USCIS, DOGE Overhaul Systematic Alien
Verification for Entitlements Database (April 22, 2025).........................10

Press Release, DOJ, *Justice Department Sues Virginia for Failure to Produce
Voter Rolls* (Jan. 16, 2026) .....................................................................12

Press Release, DOJ, *Two Iranian Nationals Charged for Cyber-Enabled
Disinformation and Threat Campaign Designed to Influence the 2020 U.S.
Presidential Election* (Nov. 18, 2021) .....................................................32

S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th
Cong., 2d Sess., Legislative History of the Privacy Act of 1974 - S. 3418
(Pub. L. No. 93-579), Source Book on Privacy (1976) ...........................28

Sarah N. Lynch, *US Justice Department considers handing over voter roll data
for criminal probes, documents show*, Reuters (Sept. 9, 2025) ...............11

Statement from Sec'y Simon, Minn. Sec'y of State (Jan. 25, 2026) .........3, 9

Stephen Sorace, *Texas sends voter rolls to DOJ to look for ineligible
registrations*, Fox News (Jan. 12, 2026)..................................................24

**Other Authorities—continued**

U.S. Gov't Accountability Off., GAO-24-107231, High-Risk Series: Urgent
Action Needed to Address Critical Cybersecurity Challenges Facing the
Nation (2024) ..................................................................................................32

*US Congressional Budget Office hit by cybersecurity incident*, Reuters (Nov. 7,
2025) ..............................................................................................................32

*US warns that hackers using f5 devices to target government networks*, Reuters
(Oct. 15, 2025) ...............................................................................................32

USCIS, SAVE Agency Search Tool (last accessed Jan 28, 2026) .........................11, 12

USCIS, USCIS Enhances Voter Verification Systems (Nov. 3, 2025) ........................12

Vivian Jones, *TN sends voter data including SSNs to DOJ, and DNC threatens
lawsuit*, Nashville Tennessean (Jan. 9, 2026) ........................................................7, 8

## INTRODUCTION

This case is a stark reminder of just how "vital" FOIA is "to ensure an informed citizenry," to maintain "the functioning of a democratic society," to "check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

CREW is requesting records to shed light on the Department of Justice's unprecedented campaign to collect unredacted voter registration lists from states across the country in pursuit of building a "national voter roll" at DOJ's Civil Rights Division. The voter data that DOJ is compiling includes millions of Americans' most sensitive personally identifiable information ("PII"), including Social Security numbers, driver's license numbers, home addresses, and dates of birth, as well as politically sensitive data such as voter participation history and party affiliation. DOJ plans to use this national voter roll to conduct voter "list maintenance verification," with the help of a private "contractor."[1] As one federal court recently held, DOJ's dragnet collection and centralization of millions of Americans' sensitive voter data far exceeds the agency's statutory authority, violates multiple statutes designed to protect Americans' privacy and data security, and "risk[s] threaten[ing] the right to vote which is the cornerstone of American democracy." *United States v. Weber*, No. 25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026). And yet, DOJ's actions have been shrouded in secrecy. So the public has no visibility into *how* DOJ is carrying out this illicit, ongoing operation.

In exceptional cases like this one "involving ongoing proceedings of national importance, courts in this district have concluded that a delay in processing of a FOIA request would cause

---

[1] Civil Rights Division, DOJ, Proposed Wisconsin Memorandum of Understanding, at 7, https://stateline.org/wp-content/uploads/2025/12/VRLData-Sharing-Agreement-DOJ-WI-2.pdf ("Proposed Wisconsin MOU").

irreparable harm" and issued preliminary injunctive relief to compel expediting processing.

*Citizens for Responsibility & Ethics in Washington v. U.S. DOGE Serv. ("CREW v. DOGE")*,

769 F. Supp. 3d 8, 28 (D.D.C. 2025), *reconsideration denied*, No. 25-cv-511-CRC, 2025 WL

863947 (D.D.C. Mar. 19, 2025). CREW is entitled to such relief here.

　　To start, CREW is likely to succeed on the merits with respect to its expedited FOIA

requests to DOJ's Civil Rights Division and Criminal Division. It is undisputed that each

Division missed its statutory deadline to make determinations on CREW's FOIA requests. And

CREW is entitled to expedited processing of its requests for two independent reasons. First,

CREW needs to inform the public about alleged federal government activity—DOJ's collection

of voters' confidential and sensitive data and creation of a national voter roll—and CREW is

primarily engaged in disseminating information. Second, CREW is seeking information on

matters of widespread and exceptional media interest that raise questions about the government's

integrity and will affect public confidence—namely, whether DOJ is flouting federal law while

endangering millions of Americans' fundamental rights.

　　For similar reasons, DOJ's failure to expeditiously respond to CREW's FOIA requests is

causing irreparable harm and is contrary to the public interest. DOJ's dragnet collection of

millions of Americans' voter data so that it can create a "1984"-style centralized database is

ongoing, national in scope, and of utmost importance. And "the subject matter of [CREW's]

FOIA request[s]" is especially "time sensitive due to . . . impending election[s]" this year, as well

as "the American public['s] . . . need to know information regarding [DOJ's] investigations into

matters potentially affecting voting rights while the inquiries are still ongoing." *Protect

Democracy Project, Inc. v. DOJ*, 498 F. Supp. 3d 132, 142 (D.D.C. 2020). DOJ already has

collected almost a dozen states' full voter rolls and is suing another two dozen states and the

District of Columbia to try to force them to fall in line. Two courts have already concluded DOJ's efforts are unlawful, with one declaring them "antithetical to the promise of fair and free elections our country promises and the franchise that civil rights leaders fought and died for." *Weber*, 2026 WL 118807, at *2; *see also* Minute Order, *United States v. State of Oregon*, 6:25-cv-1666, Dkt. No. 68 (D. Or. Jan. 26, 2026). Despite those decisions, DOJ is not backing down but rather is escalating its strong-arm tactics. Indeed, mere days ago, in the wake of federal agents killing two people in Minneapolis, the U.S. Attorney General sent the Governor of Minnesota a coercive demand letter conditioning the withdrawal of federal immigration agents occupying Minnesota on the state turning over all its voter data to DOJ.[2] Amid this rapidly evolving factual landscape, and with elections looming throughout the year, the public remains in the dark about how precisely DOJ is using the sensitive voter data it is amassing, and what (if anything) it is doing to safeguard that data.

In sum, the information CREW is seeking will "contribute[] to an informed electorate capable of developing knowledgeable opinions and sharing those knowledgeable opinions with their elected leaders." *Ctr. for Pub. Integrity v. DOD*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019) (Kollar-Kotelly, J.). And "[b]ecause the urgency with which [CREW] makes its FOIA request is predicated on a matter of current national debate," a "likelihood for irreparable harm exists if [its] FOIA request[s] do[] not receive expedited treatment." *Id.* (quoting *Washington Post v. DHS*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006)).

---

[2] Statement from Sec'y Simon, Minn. Sec'y of State (Jan. 25, 2026) https://perma.cc/U4KJ-DTW9 (describing DOJ's request as an "outrageous attempt to coerce Minnesota into giving the federal government private data on millions of U.S. Citizens in violation of state and federal law.").

The Court should enter a preliminary injunction requiring DOJ to expedite processing of CREW's FOIA requests and produce all nonexempt records along with a *Vaughn* index on a rolling basis, processing no fewer than 5,000 pages of potentially responsive records per month. The Court should further order DOJ to prioritize processing and production of the following sub-categories of requested records: (1) records reflecting data sharing agreements with any state or local official or private party regarding state voter data, (2) records reflecting agreements with any private contractor retained to assist DOJ in reviewing state voter data, (3) records relating to DOJ's use of the Department of Homeland Security's ("DHS's") "SAVE" system for voter citizenship checks, and (4) privacy or data security policies and procedures for state voter data containing PII.

## BACKGROUND

### I. Factual background

#### A. The Trump Administration is seeking to exert unprecedented control over our state-run election infrastructure.

The Trump Administration is waging an unprecedented campaign to seize control of election administration—a responsibility our Constitution and federal laws entrust to the states. On March 25, 2025, President Trump signed Executive Order 14248 (the "Elections Executive Order"), *Preserving and Protecting the Integrity of American Elections*, with the stated purpose of protecting "the franchise of American citizens and their right to participate in fair and honest elections." 90 Fed. Reg. 14005 (Mar. 25, 2025). The Elections Executive Order makes several false claims as a basis for exerting federal control over election administration. For example, it repeatedly asserts that "the United States has not adequately enforced Federal election

requirements" and that states have "fail[ed] to adequately vet voters' citizenship," *id.*, despite extensive evidence that voting by noncitizens is vanishingly rare.[3]

Relying on these baseless assertions, the Elections Executive Order purports to require states to share an unprecedented volume of sensitive voter data with the federal government. It calls upon the Secretary of Homeland Security to review state voter records, requested "through subpoena where necessary," alongside federal immigration databases so that it may supply the Attorney General with "complete information on all foreign nationals who have indicated on any immigration form that they have registered or voted" in an election.[4] The Attorney General must also "take all appropriate action to enter into information-sharing agreements . . . with the chief State election official or multi-member agency of each State."[5] The Executive Order further directs the Attorney General to "prioritize enforcement of Federal election integrity laws in such States" and review DOJ grants for state and local law enforcement "for potential withholding."[6]

Courts across the country—including this Court—have permanently enjoined implementation of key provisions of the Elections Executive Order on the ground that they exceed the President's authority and "cannot be implemented in a manner consistent with the separation of powers under our Constitution." *League of United Latin Am. Citizens v. Exec. Off. of President*, --- F. Supp. 3d ----, No. 25-cv-946-CKK, 2025 WL 3042704, at *32 (D.D.C. Oct. 31, 2025) ("*LULAC*"); *see also Washington v. Trump*, --- F. Supp. 3d ----, No. 25-cv-602-JHC,

---

[3] *See, e.g.*, Jude Joffe-Block, *6 facts about false noncitizen voting claims and the election*, NPR (Nov. 5, 2024) https://perma.cc/62L9-RVSC ("After the 2016 election, the Brennan Center for Justice … surveyed local election officials in 42 jurisdictions with high immigrant populations and found just 30 cases of suspected noncitizens voting out of 23.5 million votes cast, or 0.0001%.").

[4] Elections Exec. Order, 90 Fed. Reg. at 14007.

[5] *Id.* at 14008.

[6] *Id.*

2026 WL 73866 (W.D. Wash. Jan. 9, 2026); *California v. Trump*, --- F. Supp. 3d ----, No. 25-cv-10810-DJC, 2025 WL 2663106 (D. Mass. Sept. 17, 2025).

> **B. DOJ is demanding and compiling states' complete, unredacted voter registration lists—including PII—without statutory or constitutional authorization.**

Pursuant to the Elections Executive Order, DOJ has, since May 2025, contacted all 50 states and the District of Columbia to demand their full voter rolls.[7] The requested voter data include voters' highly sensitive PII such as Social Security numbers, driver's license numbers, full names, dates of birth, and residential addresses, as well as politically sensitive data such as voter participation history and party affiliation.[8] At least 11 states have either provided, or said they will provide, their full statewide voter registration list including PII.[9] DOJ's Criminal Division also has sent its own emails and letters to states' chief election officials,[10] requesting meetings to discuss an "information-sharing agreement" for the purpose of implementing the

---

[7] Assistant Attorney General Harmeet Dhillon (@AAGDhillon), X (Dec. 5, 2025, 1:02 PM), https://perma.cc/M7EU-7MT9.

[8] Kaylie Martinez Ochoa, Eileen O'Conner, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Jan. 16, 2026), https://tinyurl.com/ypf63y95; *see also, e.g.*, Letter from Harmeet K. Dhillon, Assistant Att'y Gen., to Shenna Bellows, Me. Sec'y of State (Aug. 18, 2025), https://perma.cc/Z8QQ-3DAR.

[9] *Id.*

[10] *See, e.g.*, E-mail from Scott Laragy, Principle Deputy Director of the Executive Office for U.S. Att'ys, and Paul Hayden, Senior Counsel at the Dept. of Justice Criminal Division, to Stephanie Thomas, Sec'y of State of Conn. (July 10, 2025), https://perma.cc/5ZC9-AD6P; *see also* E-mail from Scott Laragy, Principle Deputy Director of the Executive Office for U.S. Att'ys, and Paul Hayden, Senior Counsel at the Dept. of Justice Criminal Division, to Gregg Amore, Sec'y of State of RI (July 10, 2025), https://perma.cc/3QVN-XCXT.

Elections Executive Order.[11] DOJ's reported objective is to amass "the largest set of national

voter roll data it has ever collected."[12]

DOJ has released virtually no information to the public explaining how it is storing,

analyzing, deploying, disseminating, or protecting the sensitive voter data it has already collected

or plans to collect from states. However, press outlets have published a proposed "Memorandum

of Understanding" ("MOU") that DOJ reportedly urged Wisconsin to execute (which Wisconsin

refused), shedding some light on DOJ's clandestine efforts.[13] Among other things, the Proposed

Wisconsin MOU specifies that Wisconsin's voter data, if transferred to DOJ, would have been

stored in a system of records housed at the Civil Rights Division, and that DOJ would have been

entitled to disclose the data to "a contractor with the Department of Justice who needs access to

the [voter registration list]/Data information in order to perform duties related to the

Department's list maintenance verification procedures."[14] DOJ has not publicly disclosed which

"contractor" it has retained, if any, to perform these functions. Nor has DOJ released any

executed MOUs for the states that are in fact sharing sensitive voter data with DOJ.

Moreover, election administrators in some states—like Tennessee—have provided the

state's full voter rolls to DOJ seemingly without executing *any* MOU, raising significant

concerns about the lack of guardrails over that data sharing.[15] Tennessee agreed to turn over its

---

[11] Martinez Ochoa *et al.*, *supra* n. 8. Those states include Oregon, Nevada, Arizona, New
Mexico, Nebraska, North Dakota, Wisconsin, Georgia, Michigan, Virginia, Pennsylvania,
Vermont, Connecticut, and Rhode Island.

[12] Devlin Barrett & Nick Corsaniti, *Trump Administration Quietly Seeks to Build National Voter
Roll*, NY Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-
registration-data.html.

[13] Proposed Wisconsin MOU, *supra* n. 1.

[14] *Id.*

[15] Vivian Jones, *TN sends voter data including SSNs to DOJ, and DNC threatens lawsuit*,
Nashville Tennessean (Jan. 9, 2026), https://perma.cc/2WT5-F7SK ("It is our understanding that

full voter rolls but declined to sign the MOU because it concluded the MOU's terms "contradict[] the same laws the MOU seeks to enforce, namely the National Voter Registration Act."[16] Other states, however, have signed an MOU with DOJ, raising questions about whether those MOUs include the terms Tennessee deemed objectionable. Texas signed such an MOU, but also said in a separate letter to DOJ that submitting its full voter rolls to DOJ would not "limit or affect the duties, responsibilities, and rights" of Texas under federal laws, in an apparent attempt to hedge against the MOU's inconsistency with federal law.[17]

When states have denied DOJ's voter data demands, the agency has taken aggressive actions to compel compliance. DOJ has sued 24 states and Washington, D.C. for refusing to provide their full voter registration files.[18] These nearly identical cases assert that the DOJ is entitled to the lists under the Civil Rights Act of 1960, 52 U.S.C. § 20701 *et seq.*, the National Voter Registration Act, 52 U.S.C. § 20503 *et seq.*, and the Help America Vote Act, 52 U.S.C. § 20901 *et seq.*

Thus far, despite DOJ bombarding states with motions to compel immediate production of full voter rolls, none of its efforts have succeeded. Indeed, two federal courts recently dismissed DOJ's suits seeking access to California's and Oregon's full voter registration data for tens of millions of voters, with the California court reasoning that DOJ "seeks to use civil rights legislation which was enacted for an entirely different purpose to amass and retain an

---

despite the concerns raised by a group of Secretaries of State earlier this week, no amendments will be made to the draft Memorandum of Understanding ('MOU'). Since our concerns have not been addressed, we must decline to sign the MOU.").

[16] *Id.*

[17] Natalia Contreras & Gabby Birenbaum, *Texas hands over complete list of registered voters to Trump administration*, The Texas Tribune (Jan. 9, 2026), https://perma.cc/7TJU-LNGM.

[18] Martinez Ochoa *et al.*, *supra* n. 8.

unprecedented amount of confidential voter data," and that "[t]his effort goes far beyond what Congress intended when it passed the underlying legislation." *Weber*, 2026 WL 118807, at \*20; *see also* Minute Order, *State of Oregon*, 6:25-cv-01666, ECF Dkt. 68 (D. Or. Jan. 26, 2026).

Despite those decisions, DOJ has only escalated its efforts to pressure states into complying with its voter data demands. In the wake of federal agents killing two American citizens in Minneapolis, the U.S. Attorney General sent the Minnesota Governor a letter on January 24, 2026, claiming the Governor could "restore the rule of law" in the state by, among other things, complying with DOJ's unrelated demands for voter registration data, over which DOJ is currently suing the state.[19] The Attorney General wrote, "I am confident that these simple steps will help bring back law and order to Minnesota and improve the lives of Americans."[20] On January 25, 2026, the Minnesota Secretary of State issued a statement emphatically denying the Attorney General's request, calling it "an outrageous attempt to coerce Minnesota into giving the federal government private data on millions of U.S. Citizens in violation of state and federal law."[21] He added that it was "deeply disturbing that the U.S. Attorney General would make this unlawful request a part of an apparent ransom to pay for our state's peace and security."[22]

Election administrators in other states being sued by DOJ over voter roll demands have taken notice of these tactics, expressing similar shock at the Attorney General's request to Minnesota. The Colorado Secretary of State said that the Attorney General is "using the violence, pain, and chaos that ICE is inflicting as a pretext to double down on their unlawful

---

[19] Jeff Wald, *Minneapolis shooting: AG Pam Bondi gives Gov. Walz conditions for ICE to leave Minnesota*, FOX 9 Minneapolis-St. Paul (Jan. 25, 2026), https://perma.cc/9EME-ZREP; *see also* https://perma.cc/KE7Q-5FJJ (full text of demand letter).

[20] *Id.*

[21] Statement from Sec'y Simon, *supra* n. 2.

[22] *Id.*

demands for the state's voter rolls."[23] And in Maine—which like Minnesota has been subject to

a surge of federal immigration authorities engaging in violence against locals[24]—the Secretary of

State emphasized that "Maine will never turn over our voter rolls as a ransom payment to get

ICE to end its unconstitutional assault on our state . . . . Our founders designed a system where

states and local governments, not the federal government, oversee elections to safeguard us from

exactly this — a tyrannical, power-hungry president trampling on our constitutional rights."[25]

### C. DOJ is reportedly disclosing voter data to DHS to run mass citizenship checks and plans to use the data to enable mass voter purges and challenges.

Earlier this year, DHS rolled out an overhauled version of the Systematic Alien

Verification for Entitlements ("SAVE") system, which DHS describes as a "a single, reliable

source for verifying immigration status and U.S. citizenship nationwide," aimed at "ensur[ing]

government officials can swiftly verify legal status, halting entitlements and voter fraud."[26]

DHS's overhaul of SAVE now allows users, for the first time, to run bulk searches using Social

Security numbers (and will eventually allow searches using driver's license numbers), for the

purpose of conducting mass citizenship checks to verify voter eligibility.[27] Those data elements

are precisely the same forms of PII that DOJ is prioritizing when demanding that states produce

---

[23] Matt Cohen, *'All-out assault on our democracy:' Bondi's Minnesota 'blackmail' letter draws righteous fury from state election leaders*, Democracy Docket (Jan. 27, 2026), https://perma.cc/TW8Y-VWJR.

[24] Callie Ferguson, *They watched immigration agents in Maine. Then one fired projectiles at their cars, them*, Maine Monitor (Jan. 28, 2026), https://perma.cc/7M9D-LU86.

[25] Cohen, *supra* n. 23.

[26] Press Release, DHS, DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database (April 22, 2025), https://perma.cc/Y8A5-YX3M.

[27] DHS, Privacy Threshold Analysis for the SAVE Program, at 3, 8-17 (approved July 17, 2025), https://perma.cc/9AXY-WCLU; DHS, Privacy Threshold Analysis for the SAVE Program, at 3, 8-17 (approved Sept. 11, 2025), https://perma.cc/A44N-4729.

their full voter rolls.[28] Although DOJ officials' public statements suggest DOJ is using SAVE,[29] and recent reports state that Trump Administration officials have confirmed DOJ is currently sharing or considering sharing state voter roll data with DHS,[30] DHS's website does not identify DOJ as an authorized SAVE user for voter list maintenance or voter registration purposes.[31] Nor has any SAVE memorandum of agreement with DOJ authorizing such use been made public.

DOJ also has confirmed that state voter roll data provided in response to requests from the Civil Rights Division is "being screened for ineligible voter entries."[32] In conversations with at least two states, prosecutors from the Civil Rights Division reportedly asked election officials to run their entire voter list through SAVE.[33]

---

[28] *See, e.g.*, Compl. at 15-16, *United States v. Simon*, No. 25-cv-03761, Dkt. No. 1 (Sept. 25, 2025), https://perma.cc/YJ2E-V6QG (including in prayer for relief request for order that Minnesota "provide the United States with Minnesota's current statewide voter registration list, including active and inactive voters and containing all fields, including the registrant's full name, date of birth, residential address, and either their State driver's license number or the last four digits of their social security number").

[29] *See, e.g.*, Assistant Attorney General Harmeet Dhillon, *supra* n. 7.

[30] Jonathan Shorman, *DOJ is sharing state voter roll lists with Homeland Security*, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/; *See also* Sarah N. Lynch, *US Justice Department considers handing over voter roll data for criminal probes, documents show*, Reuters (Sept. 9, 2025), https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09/ ("The U.S. Justice Department is in talks with Homeland Security Investigations about transferring the sensitive voter roll data it has collected from states for use in criminal and immigration-related investigations, according to government documents seen by Reuters. The voter registration data was gathered over the last several months by the DOJ's Civil Rights Division . . .").

[31] USCIS, SAVE Agency Search Tool (last accessed Jan 28, 2026), https://tinyurl.com/92tjrj2n.

[32] Shorman, *supra* n. 30.

[33] Barrett & Corsaniti, *supra* n. 12; Jude Joffe-Block, *A lawsuit tries to block the Trump administration's efforts to merge personal data*, NPR (Sept. 30, 2025, at 4:11 ET), https://perma.cc/3TCL-UYGE.

At least 23 states are already using SAVE to identify potential noncitizens on their state voter lists,[34] with early results revealing serious flaws with the system.[35] DHS announced that, as of November 3, 2025, the expanded SAVE system had "enabled state voting agencies to submit over 46 million voter verification queries."[36]

Echoing this figure, the Assistant Attorney General of DOJ's Civil Rights Division has claimed that the Civil Rights Division has "checked 47.5 million voter records"—apparently through SAVE—and has "found 260,000 plus dead people" and "several thousand noncitizens enrolled to vote in federal elections."[37] The AAG further indicated that DOJ intends to collect every state's full voter roll data, either voluntarily or compelled through litigation.[38] Reporting indicates that DOJ may use the voter data it obtains to enable mass voter challenges, including by coordinating with ideologically aligned "election integrity" advocates with a history of weaponizing voter data to launch mass challenges in various states.[39]

---

[34] SAVE Agency Search Tool, *supra* n. 31, https://tinyurl.com/3e9t6kva (sorted by "state" as agency and "voter list maintenance" and "voter registration" as benefit category).

[35] *See*, *e.g.*, Comment to DHS by Travis County Clerk, Travis County Tax Assessor-Collector, and Travis County (Dec. 1, 2025), https://tinyurl.com/3wrn29dv ("Travis County DHS Comment"); Natalia Contreras, *Texas flagged some voters as 'potential noncitizens' but they had already provided proof of citizenship*, Votebeat (Dec. 18, 2025), https://perma.cc/96ZE-SMML; Jude Joffe-Block, *Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU.

[36] USCIS, USCIS Enhances Voter Verification Systems (Nov. 3, 2025), https://perma.cc/H68J-5PC8.

[37] Assistant Attorney General Harmeet Dhillon, *supra* n. 7.

[38] *Id.*; *see also* Press Release, DOJ, *Justice Department Sues Virginia for Failure to Produce Voter Rolls*, (Jan. 16, 2026), https://perma.cc/PPB2-TDJV ("'This Department of Justice has now sued 24 states for failing to provide voter roll data and will continue filing lawsuits to protect American elections,' said Attorney General Pamela Bondi. 'Accurate voter rolls are the foundation of election integrity, and any state that fails to meet this basic obligation of transparency can expect to see us in court.'").

[39] Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025), https://perma.cc/W8UC-XHRS (quoting employee of EagleAI, a

### D. DOJ's actions are occurring in the shadow of impending state and federal elections.

DOJ is taking these actions ahead of imminent state and federal elections throughout 2026. Each state's individual primary election, and the November general election, represents a separate inflection point around which voters must make informed choices while also taking steps to ensure they are not denied their fundamental right to vote. Primary season is already well underway, with three states holding primary elections on March 3, 2026.[40] Raising the stakes considerably, three of the states holding March primaries—Texas, Arkansas, and Mississippi[41]— already have agreed to voluntarily turn over their full voter rolls to DOJ.[42] The last primary in a state that has already turned over its full voter rolls will occur on August 18, 2026, in Wyoming. The last primary anywhere in 2026—in Delaware—falls on September 15, 2026.[43] (Delaware is one of the 24 states that DOJ is suing for its full voter rolls.[44]) And, of course, the 2026 election cycle does not end until the November 3, 2026, general election. In other words, DOJ's quest to collect and deploy voters' sensitive data is highly salient now—in the run up to elections in a few weeks—and will maintain its significance throughout 2026.

---

mass voter registration challenge system, as stating "[w]e demonstrated the software to the DOJ. . . . I am in conversation with them about letting us have a task, a federal task, to bring their data into what we're doing and then be able to use the federal data, SAVE data, Social Security data, other data in here as well.").

[40] 2026 State Primary Election Dates, National Conference of State Legislatures (last updated Dec. 8, 2025), https://tinyurl.com/d3hby7su ("2026 State Primary Election Dates").

[41] *Id.*

[42] Martinez Ochoa, *et al.*, *supra* n. 8.

[43] *See id.*; *see also* 2026 State Primary Election Dates, *supra* n. 40.

[44] *See* Martinez Ochoa, *et al.*, *supra* n. 8.

## II.    Procedural background

On September 4, 2025, CREW submitted identical FOIA requests to DOJ's Civil

Division and Criminal Division. Compl. ¶¶ 37, 43.[45] The requests sought the following

information:

1. All formal or informal data sharing agreements between DOJ and any state or election official providing access to personally identifiable information ("PII").

2. Agency records sufficient to show:

   a. All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning DOJ's legal basis for requesting and accessing PII held by election officials.

   b. All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning the scope of DOJ's use of the PII it seeks from election officials. This includes records reflecting any plans for how the agency will compile, aggregate, synthesize, match, link or otherwise combine data obtained from an election official with any other data.

   c. Privacy or data security safeguards in place for protecting PII shared by election officials.

*Id.* Each request also sought expedited processing. *Id.* ¶¶ 39, 45.

On September 8, 2025, the Criminal Division acknowledged receipt of the request and

denied CREW's request for expedited processing under 28 C.F.R. § 16.5(e)(1)(iv). *Id.* ¶ 41. The

Criminal Division's response did not address CREW's request for expedited processing under 28

C.F.R. § 16.5(e)(1)(ii). *Compare* Compl. Ex. A (requesting expedited processing under 28 C.F.R.

§ 16.5(e)(1)(ii) "because there is an 'urgency to inform the public concerning actual or alleged

Federal Government activity,' and CREW 'is primarily engaged in disseminating information'");

---

[45] CREW is only seeking a preliminary injunction regarding the requests to the Civil Rights and Criminal Divisions.

*with* Compl. Ex. B (only responding to CREW's request for expedited processing under a different provision, 28 C.F.R. § 16.5(e)(1)(iv)).

On November 4, 2025, CREW submitted an expedited FOIA request to DOJ's Civil Rights Division. *Id.* ¶ 49. CREW sought the following records:

1. All formal or informal data sharing agreements between DOJ and any state or election official providing access to personally identifiable information ("PII").

2. All records relating to DOJ's use of the Department of Homeland Security's Systematic Alien Verification for Entitlements ("SAVE") system for purposes of verifying the citizenship of voters or voter registrants in any state.

3. Agency record sufficient to show:

   a. All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning the scope of DOJ's use of the PII it seeks from election officials. This includes records reflecting any plans for how the agency will compile, aggregate, synthesize, match, link, or otherwise combine data obtained from an election official with any other data.

   b. Privacy or data security safeguards in place for protecting PII shared by election officials.

*Id.*

CREW immediately received an automatic reply from the Civil Rights Division that said "[a]t present, the government has not been funded. It is uncertain how many days this office will be closed. The FOI/PA Branch will be unable to respond to email nor to telephone messages until funding has been authorized. Please resubmit your FOIA/PA request upon restoration of government appropriations, thank you." *Id.* ¶ 52. CREW has received no other communications from the Civil Rights Division regarding the FOIA request. *Id.* ¶ 53.

On December 19, 2025, CREW filed this suit. The complaint asserts two counts. Count I asserts that Defendants wrongfully denied expediting processing of CREW's FOIA requests. *Id.* ¶¶ 54-63. Count II asserts that Defendants are wrongfully withholding records responsive to CREW's FOIA requests. *Id.* ¶¶ 64-68.

## ARGUMENT

To obtain a preliminary injunction, a movant must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth requirements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

CREW is entitled to a preliminary injunction because it is likely to succeed on its claims that Defendant has violated FOIA, there is an urgent need to inform the public about the matters that are the subject of CREW's requests and to prevent irreparable harm if the records are not expeditiously processed and released, and the balance of equities and public interest favor the requested relief.

### I.    CREW is likely to succeed on the merits.

CREW is likely to succeed on the merits regarding its requests to the Civil Rights and Criminal Divisions because (1) DOJ has failed to meet the statutory deadline to process CREW's requests, and (2) DOJ has improperly denied CREW's requests for expedited processing.

### A.    DOJ has failed to meet the statutory deadline for processing CREW's FOIA requests.

Agencies must provide a "determination" on a FOIA request within 20 business days by "at least: (i) gather[ing] and review[ing] the documents; (ii) determin[ing] and communicat[ing] the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform[ing] the requester that it can appeal whatever portion of the 'determination' is adverse." *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n ("CREW v. FEC")*, 711 F.3d 180, 188 (D.C. Cir. 2013). In "unusual circumstances," an

agency is entitled to a 10-business-day extension of this deadline. 5 U.S.C. § 552(a)(6)(B). Upon determining the scope of any production, an agency must "make the records 'promptly available,' which depending on the circumstances typically would mean within days or a few weeks of a 'determination,' not months or years." *CREW v. FEC*, 711 F.3d at 188 (quoting 5 U.S.C. §§ 552(a)(3)(A), (a)(6)(C)(i)). An agency's failure to issue a determination by statutory deadline is a violation of FOIA. *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019). And "FOIA specifically permits courts to 'enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld.'" *Id.* at 184 (quoting 5 U.S.C. § 552(a)(4)(B)). Here, DOJ has shirked its statutory obligations to make timely determinations.

**Civil Rights Division FOIA Request**: CREW submitted its FOIA request to the Civil Rights Division on November 4, 2025. The Division never responded to CREW's FOIA request, other than sending an automated email that same day stating that "[a]t present, the government has not been funded. It is uncertain how many days this office will be closed. The FOI/PA Branch will be unable to respond to email nor to telephone messages until funding has been authorized. Please resubmit your FOIA/PA request upon restoration of government appropriations, thank you." Hill Decl., Ex. D.

Despite the Civil Rights Division's *invitation* that all FOIA filers resubmit their requests after the government shutdown ended, CREW was under no *obligation* to do so. "After receiving a FOIA request, an agency *must* make a 'determination' within 20 working days as to whether to comply with the request." *Elec. Priv. Info. Ctr. v. DHS*, 218 F. Supp. 3d 27, 34-35 (D.D.C. 2016) (emphasis added). The Civil Rights Division indisputably received CREW's FOIA request, and no statute or regulation nullifies FOIA requests an agency receives during a government

shutdown. The Anti-Deficiency Act restricts *expenditures* by federal agencies during a

shutdown; it does not, however, invalidate statutory obligations, including under FOIA, incurred

during a shutdown. *See* 31 U.S.C. § 1341(a). DOJ's own guidance regarding FOIA submissions

made during the relevant shutdown confirms as much. DOJ's Office of Information Policy

instructed that "agencies should count as part of their response times for FOIA requests and

appeals the twenty-nine days when the government was closed, which excludes all Saturdays,

Sundays, and the legal public holidays that occurred during the lapse in appropriations. *As a*

*further clarification, agencies should use the automatically generated received date as the 'date*

*received' for electronic communication*." Office of Information Policy Guidance, Calculating

FOIA Response Times after the 2025 Government Shutdown, DOJ Office of Information Policy

(Nov. 18, 2025) https://perma.cc/J3QY-J3QT (emphasis added).

Using the automatically generated received date for CREW's FOIA request to the Civil

Rights Division as the "date received," DOJ's deadline to respond began to accrue when the

government shutdown ended, on November 12, 2025. *See id.*; *see also* Standing Order No. 25-59

(JEB), *In re Extension of Deadlines in Civil Matters Involving the United States Following*

*Restoration of Appropriations* (D.D.C. Nov. 13, 2025), https://tinyurl.com/3dfxzb3y (stating

shutdown ended on November 12, 2025). Thus, the Civil Rights Division's 20-business-day-

deadline to respond to CREW's FOIA request was December 11, 2025. *See* 5 U.S.C. §

552(a)(6)(A)(i). As of the date of this filing, the Civil Rights Division is therefore 33 business

days delinquent in providing a determination on CREW's FOIA request.

**Criminal Division FOIA Request**: The Criminal Division acknowledged that it received

CREW's FOIA request on September 16, 2025. Hill Decl. ¶ 8; *see also* Hill. Decl., Ex. B p. 1.

Thus, the Criminal Division's 20-business-day-deadline to respond to CREW's FOIA request

was October 15, 2025. *See* 5 U.S.C. § 552(a)(6)(A)(i). As of the date of this filing, the Criminal

Division is 72 business days delinquent in providing a determination on CREW's FOIA request.

Because DOJ violated FOIA by flouting its statutory deadlines, CREW is "certain to

succeed on the merits of its claim that [DOJ] owes it a determination on its requests." *Am.*

*Oversight*, 414 F. Supp. 3d at 186. "And since disclosure of non-exempt documents must follow

shortly thereafter, the Court may order those disclosures at the same time under its customary

supervisory authority in FOIA matters." *Id.*

### B.  DOJ improperly denied CREW's requests for expedited processing.

CREW also is entitled to expedited processing of its FOIA requests, which "is a statutory

right, not just a matter of court procedure." *Edmonds v. F.B.I.*, 417 F.3d 1319, 1323 (D.C. Cir.

2005). "A court reviews an agency's denial of expedited processing *de novo*." *Ctr. for Pub.*

*Integrity*, 411 F. Supp. 3d at 11; *see also* 5 U.S.C. § 552(a)(6)(E)(iii). Further, where an agency's

denial of expedited processing "does nothing more than parrot its own regulatory language, and

offer[s] no reasoning or analysis, its decision, as in the APA context, is entitled to little

deference." *Citizens for Responsibility and Ethics in Washington v. DOJ ("CREW v. DOJ")*, 436

F. Supp. 3d 354, 361 (D.D.C. 2020).

Here, CREW's FOIA requests asserted two independent grounds for expedited

processing. *First*, the requests fulfill an urgent need "to inform the public about an actual or

alleged Federal Government activity" and are "made by a person who is primarily engaged in

disseminating information." 5 U.S.C. §§ 552(a)(6)(E)(v)(I)-(II); *see also* 28 C.F.R. §

16.5(e)(1)(ii) (DOJ regulation promulgating the same standard). *Second*, CREW's requests

concern "[a] matter of widespread and exceptional media interest in which there exist[s] possible

questions about the government's integrity that affect public confidence." 28 C.F.R. §

16.5(e)(1)(iv). The Civil Rights Division failed entirely to respond to CREW's request for

expedited processing, *see* Hill Decl., Ex. D, which served as a constructive denial. *See* 5 U.S.C. §
552(a)(6)(E)(iii) (agency's failure to respond within 10 calendar days to a request for expedited
processing is subject to judicial review); *see also* 28 C.F.R. § 16.5(e)(4). Although CREW
requested expedited processing for two separate reasons, under 28 C.F.R. § 16.5(e)(1)(ii) and
(iv), *see* Hill Decl. ¶ 7; *see also* Hill Decl., Ex. A p. 4, the Criminal Division only responded to
the latter justification—with a summary denial—stating "[y]ou have requested expedited
processing of your request pursuant to 28 C.F.R. § 16.5(e)(1)(iv). The [DOJ] Director [Director
Public Affairs] has determined that your request for expedited processing should be denied." Hill
Decl., Ex. B p. 1.

    **1.  CREW is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(ii).**

    CREW is entitled to expedited processing because (1) CREW is primarily engaged in
information dissemination, and (2) there is a clear urgency to inform the American public about
the topics of CREW's requests.

    **CREW is primarily an information disseminator:** Judges in this District have
repeatedly confirmed that "CREW is primarily engaged in disseminating information to the
public and 'routinely disseminates information obtained through FOIA to the public,' including
on its website." *CREW v. DOGE*, 769 F. Supp. 3d. at 26-27; *see also Citizens for Responsibility
& Ethics in Washington v. DOJ*, 820 F. Supp. 2d 39, 45 (D.D.C. 2011) ("CREW freely and
publicly disseminates those records it acquires through FOIA requests."). For the reasons set
forth in CREW's requests, *see* Hill Decl. Exs. A, C, CREW "easily" satisfies this requirement.
*CREW v. DOGE*, 769 F. Supp. 3d. at 26.

    **There is a clear urgency to inform the public**: In determining whether a FOIA
requester has demonstrated an "urgency" that warrants expedited processing, courts "must
consider . . . (1) whether the request concerns a matter of current exigency to the American

public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001). CREW's requests check each box.

*First*, the requests demonstrate that they concern matters of "current exigency" to the American public because they directly relate to ongoing public debates and "currently unfolding stories" about the Trump Administration's attempts to collect and compile state voter roll data and PII of millions of American citizens, *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 98 (D.D.C. 2020), ahead of "impending" 2026 elections, *Protect Democracy Project*, 498 F. Supp. 3d at 139-141 (finding urgency to inform the public about "DOJ's potential interference" in "upcoming elections").

Since early 2025, DOJ officials in both the Criminal and Civil Rights Divisions have sent letters, emails, and phone requests to state election officials seeking voter registration rolls, election records, and unredacted identifiers such as Social Security and driver's license numbers.[46] DOJ has already obtained—and is accessing—full voter rolls from at least 11 states.[47] And DOJ is suing 24 other states and the District of Columbia to obtain their full voter rolls as well.[48] Most recently, just six days ago, the U.S. Attorney General sent an alarming demand letter to Minnesota conditioning the withdrawal of federal agents from Minnesota on the state turning over its voters' data to DOJ, which the Minnesota Secretary of State likened to an attempted "ransom to pay for our state's peace and security."[49]

Heightening the urgency to inform, DOJ is not backing down despite a federal court

---

[46] Barrett & Corasaniti, *supra* n. 12.

[47] Martinez Ochoa *et al.*, *supra* n. 8; *see also supra* n. 10.

[48] *Id.*

[49] *See supra* n. 19.

recently ruling that DOJ's "nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database" is "unprecedented and illegal." *Weber*, 2026 WL 118807, at *1. And DOJ is taking these unprecedented actions pursuant to an Executive Order that numerous courts have held exceeds the President's authority and violates the separation of powers. *See LULAC*, 2025 WL 3042704; *Washington*, 2026 WL 73866; *California*, 2025 WL 2663106.

Moreover, DOJ is escalating its demands for voter data ahead of the impending 2026 elections, potentially with the goal of conducting mass voter citizenship checks and enabling mass voter challenges based on the data it obtains. *See supra* Background §§ 1.C, D. These approaching elections further heighten the urgency to inform the public about the subjects of CREW's requests — so voters can (1) protect their fundamental rights by making sure they are not disenfranchised, and (2) exercise that fundamental right to vote with as much information in tow as possible about how the Trump Administration is conducting itself. *See Protect Democracy Project*, 498 F. Supp. 3d at 140 (holding that "DOJ's potential interference with postal services . . . was a matter of 'current exigency,' particularly given the imminence of Election Day and the widespread media attention to the issue of voter fraud and slowed postal service deliveries"); *see also Wash. Post*, 459 F. Supp. 2d at 74-75 (granting preliminary injunction for White House visitor logs based on the upcoming midterm elections); *Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d at 260 (D.D.C. 2005) (ordering expedited processing of documents concerning federal elections based on imminent expiration of the Voting Rights Act).

*Second*, further delay in processing CREW's requests would "compromise a significant recognized interest." *Al-Fayed*, 254 F.3d at 310. "The Supreme Court has observed that a public

informed about its government's actions is 'a structural necessity in a real democracy.'" *Brennan Ctr.*, 498 F. Supp. 3d at 101 (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). "[T]imely awareness is equally necessary because 'stale information is of little value.'" *Id.* (quoting *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)). Here, the issues to which CREW's FOIA requests relate—DOJ's collection of millions of voters' sensitive personal information—are "of the highest national concern." *CREW v. DOGE*, 769 F. Supp. 3d at 28 (citation modified). Further delay in processing CREW's requests places CREW "at risk of losing its ability to timely facilitate public awareness regarding the subject matter of its request." *Protect Democracy Project*, 498 F. Supp. 3d at 139-141; *see also CREW v. DOGE,* 769 F. Supp. 3d at 28 (similar, regarding ongoing debates about DOGE's rapid takeover and dismantling of federal agencies); *Gonzales*, 404 F. Supp. 2d at 260 (similar, regarding ongoing debate about re-authorization of the Voting Rights Act).

Delaying a response to CREW's requests also risks compounding DOJ's ongoing violations of millions of Americans' voting and privacy rights. *See Protect Democracy Project*, 498 F. Supp. 3d at 139-40. As noted, one court already has concluded that DOJ's effort "to amass and retain an unprecedented amount of confidential voter data" violates and otherwise burdens Americans' "fundamental privacy and voting rights." *Weber*, 2026 WL 118807, at *20; *see also id.* *13-14, *17-19. For these reasons, state officials across the country have refused DOJ's voter data requests.[50] Expedited processing is needed so that the public—and especially voters in those states that have voluntarily provided full voter roll data to DOJ—can evaluate the extent to which their privacy and voting rights have been endangered. Any further delay in processing will prevent the public "'from obtaining in a timely fashion information vital to the

---

[50] *See* Martinez Ochoa, *et al.*, *supra* n. 8.

current and ongoing debate surrounding the legality of' a high-profile government action."

*CREW v. DOGE*, 769 F. Supp. 3d at 27 (quoting *Protect Democracy Project, Inc. v. DOD*, 263

F. Supp. 3d 293, 299 (D.D.C. 2017)).

    *Third*, CREW's FOIA requests all clearly concern federal government activity because

they each seek records about DOJ, "a federal agency," and actions by DOJ to access state voter

data. *Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 419 F. Supp. 3d 82, 95 (D.D.C. 2019).

    CREW thus easily meets each of the three requirements for expedition under 28 C.F.R. §

16.5(e)(1)(ii).

### 2.   CREW is separately entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv).

    Separately, CREW is entitled to expedited processing because its FOIA requests concern

"[a] matter of widespread and exceptional media interest in which there exist[s] possible

questions about the government's integrity that affect public confidence." 28 C.F.R. §

16.5(e)(1)(iv). CREW's requests "must simply provide grounds to support the contention that the

matter is time sensitive, and that it is a 'matter of widespread and exceptional media interest in

which there exist *possible* questions about the government's integrity that affect public

confidence.'" *CREW v. DOJ*, 436 F. Supp. 3d at 361 (quoting 28 C.F.R. § 16.5(e)(1)(iv))

(emphasis in original). CREW's FOIA requests highlighted significant questions about the

lawfulness of DOJ's conduct and its potential violation of voters' privacy rights. Hill Decl., Ex.

A pp. 4-5, Ex. C pp. 5-6. And CREW explicitly showed that "DOJ's demands have been the

subject of national press coverage, including reports by the Associated Press, Washington Post,

and San Francisco Chronicle." Hill Decl., Ex. A p. 5, Ex. C p. 6.[51] These reports have focused on

---

[51] *See also* Fredreka Schouten, *Trump's Justice Department seeks voter rolls from Michigan, a key battleground*, CNN (July 23, 2025), https://perma.cc/MP76-H6GS; Barrett & Corasaniti, *supra* n. 12; Stephen Sorace, *Texas sends voter rolls to DOJ to look for ineligible registrations*,

the unprecedented nature of the federal government's interference in state election administration and questions about the lawfulness of this interference, including questions about the purpose of DOJ's data collection efforts. Such coverage reflects widespread public interest and raises serious questions of government integrity. That national interest is only growing following DOJ's recent coercive demand to Minnesota conditioning the withdrawal of federal agents from the state on its disclosure of its full voter roll data.[52] Thus, CREW is separately entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv).

## II.    CREW will be irreparably harmed absent preliminary relief.

For reasons similar to CREW's likelihood of success on its expedited processing claim, immediate relief is necessary to prevent irreparable harm to CREW. "District courts in this circuit have recognized that, where an obligation to disclose exists, a plaintiff may suffer irreparable harm if denied access to information that is highly relevant to an ongoing public debate." *Protect Democracy Project*, 498 F. Supp. 3d at 141 (citing cases). In such cases, delayed production irreparably harms information-providers, like CREW, because "stale

---

Fox News (Jan. 12, 2026), https://tinyurl.com/3myrkkf8; Aaron Pellish, *DOJ sues 6 states for private voter data, voting rolls*, Politico (Sept. 25, 2025), https://tinyurl.com/3m77mjzv; Patrick Marley & Yvonne Wingett Sanchez, *DOJ hits states with broad requests for voter rolls, election data*, Washington Post (July 16, 2025), https://archive.ph/6aqa8; *see also*, *e.g.*, Maya Homan, *Raffensperger rebuffs pressure campaign to hand over sensitive voter data to feds*, Georgia Recorder (Jan. 23, 2026), https://tinyurl.com/yc5twtkv; Molly Beck, *What to know about the Trump DOJ's quest for Wisconsin voter data*, Milwaukee Journal Sentinel (Dec. 22, 2025), https://archive.ph/JZLyX.

[52] *See*, *e.g.*, *Fontes accuses DOJ of 'blackmail' over Minnesota voter data and ICE removal offer*, Fox 10 Phoenix (Jan. 25, 2026), https://perma.cc/7W3N-873P; Camilo Montoya-Galvez & Joe Walsh, *Bondi seeks Minnesota voter rolls, welfare data to "help bring back law and order" in wake of shootings*, CBS News (Jan. 25, 2026), https://perma.cc/M9FR-3KYR; *Pam Bondi Offers To Pull ICE out of Minneapolis if Voter Files Handed Over*, Newsweek (updated Jan. 26, 2026), https://tinyurl.com/hb5rvs7h.

information is of little value." *Brennan Ctr.*, 498 F. Supp. 3d at 101 (quoting *Payne Enters.*, 837 F.2d at 494). Put differently, DOJ's delay in processing CREW's FOIA requests concerning "ongoing proceedings of national importance" irreparably harms CREW because "'the primary value of the information lies in [CREW's] ability to inform the public' about those ongoing proceedings." *Id.* (quoting *Ctr. for Public Integrity*, 411 F. Supp. 3d at 11, 12); *accord Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017); *Ctr. for Public Integrity*, 411 F. Supp. 3d at 12-13 (collecting cases). This reasoning applies with special force where, as here, the "subject matter of [the plaintiff's] FOIA request is time sensitive due to . . . impending election[s]." *Protect Democracy Project*, 498 F. Supp. 3d at 142; *accord Wash. Post*, 459 F. Supp. 2d at 74-75.

CREW has amply demonstrated irreparable harm under this framework. To start, DOJ's data collection efforts are "national" in scope, since the agency has already reached out to all 50 states.[53] DOJ's efforts also are "ongoing." DOJ is continuing to press its demands for states' full voter rolls in federal courts on a daily basis, and the requested records will shed light on how DOJ is *currently using*, disclosing, and protecting (if at all) the sensitive voter data it has collected or seeks to collect from states, as well as how DOJ will use any potentially forthcoming voter data that DOJ is *currently seeking. See* Hill Decl., Ex. A pp. 1-2, Ex. C pp. 1-2 (requesting (1) "[a]ll formal or informal data sharing agreements between DOJ and any state or election official providing access to" voters' PII, (2) "[a]ll formal or informal policies . . . concerning the scope of DOJ's use of the PII it seeks from election officials," and (3) the "[p]rivacy or data security safeguards in place for protecting PII shared by election officials"). And "the subject matter of [CREW's] FOIA request[s] is time sensitive due to . . . impending election[s]." *Protect*

---

[53] Assistant Attorney General Harmeet Dhillon, *supra* n. 7.

*Democracy Project*, 498 F. Supp. 3d at 142. As described above, two states that have already turned over their full voter rolls to DOJ—Texas and Arkansas—have impending primary elections in the first week of March. *See supra* Background §1.D. But because the *last* such elections involving states complying with DOJ—the Wyoming primary election in August and November general election in every state[54]—are still many months away, the information CREW is seeking will have enduring importance. For each election between March and November, CREW and "the American public . . . need to know information regarding [DOJ] investigations into matters potentially affecting voting rights while the inquiries are still ongoing." *Protect Democracy Project*, 498 F. Supp. 3d at 142.

That alone establishes irreparable harm. But as explained below, the requested records also concern ongoing issues of national importance in at least three additional respects: (1) they bear on millions of Americans' privacy and voting rights and DOJ's potential violations of law, (2) they will shed light on how DOJ is actually using voters' sensitive PII, and (3) they will establish what—if anything—DOJ is doing to protect voters' PII from misuse and security breaches.

### A. The requested records concern ongoing proceedings of national importance regarding potential violations of federal laws and fundamental rights.

DOJ's ongoing efforts to collect and consolidate millions of Americans' sensitive voter data into a never-before-seen "national voter roll" is a privacy-rights issue of national importance. A key objective of the Privacy Act of 1974 was to prevent the government from secretly creating "formal or de facto national data banks," "centralized Federal information systems," or "anything resembling a '1984' personal dossier on a citizen." S. Comm. on Gov't

---

[54] *See* Marinez Ochoa, *et al. supra* n. 8; 2026 State Primary Election Dates *supra* n. 40.

Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of

the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy, at 16 (1976),

https://perma.cc/9W9F-R5ZL; *see also DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S.

749, 766 (1989) ("The Privacy Act was passed largely out of concern over 'the impact of

computer data banks on individual privacy.'" (quoting H.R. Rep. No. 93-1416, at 7 (1974)).

Now, as the *Weber* court found, DOJ "stands at the precipice of making Congress' fears come to

life." 2026 WL 118807, at *20.

　　DOJ's voter data dragnet also raises significant ongoing issues of national importance

regarding Americans' voting rights. In the words of the *Weber* court, DOJ's actions will "have a

chilling effect on voter registration which would inevitably lead to decreasing voter turnout as

voters fear that their information is being used for some inappropriate or unlawful purpose. This

risk threatens the right to vote which is the cornerstone of American democracy." 2026 WL

118807, at *20. And "the American public has a need to know information regarding

investigations into matters potentially affecting voting rights while the inquiries are still

ongoing." *Protect Democracy Project*, 498 F. Supp. 3d at 142. DOJ's recent coercive "ransom"

demand for Minnesota's voter data has only heightened the public urgency and interest in the

requested information.

　　Relatedly, CREW's requests implicate substantial questions about whether DOJ is

breaking the law by creating a national voter roll without statutory authorization and in violation

of multiple statutes and the separation of powers. Such a "current and ongoing debate

surrounding the legality of the Administration's" actions is a well-established issue of national

importance in the FOIA context. *Elec. Privacy Information Ctr. v. DOJ*, 416 F. Supp. 2d 30, 41

(D.D.C. 2006). CREW's requests would plainly contribute to the conversation about whether

DOJ's actions are legal. Among other things, CREW is seeking documents "concerning DOJ's legal basis for requesting and accessing PII held by election officials," Hill Decl., Ex. A pp. 1-2, and records "concerning the scope of DOJ's use of the PII it seeks from election officials." Hill Decl., Ex. A pp. 1-2, Ex. C pp. 1-2. Understanding DOJ's legal basis for demanding voter roll data and for using the information it obtains to build a federal voter roll is especially urgent in light of the recent rulings declaring DOJ's actions to collect voter data, and the Executive Order pursuant to which they were taken, unlawful. *See, e.g.*, *Weber*, 2026 WL 118807; *LULAC*, 2025 WL 3042704, at *2.

**B. The requested records concern ongoing proceedings of national importance regarding how DOJ is using the voter data it is amassing.**

CREW is also seeking documents to shed light on the nationally important question of *what DOJ is doing with the voter data* it is amassing. Neither DOJ's letters to states demanding their voter data, nor its subsequent lawsuits, disclose how DOJ intends to use voters' most sensitive data. Rather, DOJ has claimed generically that it seeks to "ascertain [each state's] compliance with the list maintenance requirements of the NVRA and HAVA," without explaining *how* it plans to do so. *See* e.g., Letter from Brittany E. Bennett to Conn. Sec'y of State Stephanie Thomas, Ex. 3 to Mot. for Order to Compel Records Demanded Pursuant to the Civil Rights Act of 1960, *United States v. Stephanie Thomas*, 26-cv-00021, Dkt. No. 9-4 at 1 (D. Conn. Jan. 7, 2026), https://perma.cc/4PEE-2RNC. Further, public reporting suggests that some states have entered into undisclosed MOUs with DOJ dictating some terms, while at least one state refused to sign an MOU but still turned over its full voter rolls to the Civil Rights

Division.[55] This raises serious questions about what terms—if any—govern DOJ's use of voters' PII and what obligations states have as a result of sharing their voter data with DOJ.

CREW is seeking records to fill this information gap, including (1) "[a]ll formal or informal data sharing agreements between DOJ and any state or election official providing access to" voters' PII, (2) "[a]ll formal or informal policies . . . concerning the scope of DOJ's use of the PII it seeks from election officials," including "records reflecting any plans for how the agency will compile, aggregate, synthesize, match, link or otherwise combine" the data, and (3) "[a]ll records relating to DOJ's use of the [SAVE] system for purposes of verifying the citizenship of voters or voter registrants in any state." Hill Decl., Ex. A pp. 1-2, Ex. C pp. 1-2. There is "significant public interest" in information that enables the public "to verify[] that [an agency] is . . . properly using . . . data" in its possession to fulfill statutory functions. *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1232 (D.C. Cir. 2008).

## C. The requested records concern ongoing proceedings of national importance relating to Americans' data security and privacy.

CREW is seeking records regarding another important topic about which the public urgently needs clarity: the "[p]rivacy or data security safeguards in place for protecting PII shared by election officials." Hill Decl., Ex. A pp. 1-2, Ex. C pp. 1-2. DOJ's communications with states assert in conclusory fashion that "[t]o the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. . . . [A]ll data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy." Conn. DOJ Letter, *supra* n. 10 at 2. But DOJ has provided no concrete details about the specific measures it has taken, if any, to protect against misuse of voters' data and external threats like hacking.

---

[55] *See supra* nn. 16-18.

Just last week, DOJ disclosed in a court filing that a federal employee "signed a 'Voter Data Agreement,' in his capacity as an SSA employee, with [an] advocacy group" whose "stated aim was to find evidence of voter fraud and to overturn election results in certain States." Notice of Corrections to the Record, *American Federation of State, County and Municipal Employees, AFL-CIO v. SSA*, No. 25-cv-598, Dkt. No. 197, at 5 (D. Md. Jan. 16, 2026). Pursuant to that "Voter Data Agreement," federal employees "could have been asked to assist the advocacy group by accessing SSA data to match to the voter rolls." *Id.* at 5 n.1. Recent reporting further indicates that DOJ itself is considering sharing the state voter data it obtains—including voters' PII—with third party organizations such as the Election Integrity Network and Eagle AI.[56] And the proposed MOU that DOJ urged Wisconsin to execute would allow DOJ to disclose state voter data to "a contractor with the Department of Justice who needs access to the [voter registration list]/Data information in order to perform duties related to the Department's list maintenance verification procedures."[57] All of these incidents demonstrate that the public needs clarity about whether voters' sensitive data is being improperly shared with third parties.

DOJ also has disclosed no information about the measures it has taken, if any, to protect against increased risks of hacking posed by its newly created PII repository. There always is a risk that electronically stored data could be hacked, breached, or stolen. But each time data is shared, that risk necessarily increases, both during the transfer process and because each custodian of records becomes an additional target. And the federal government is an especially big and bright bullseye for hackers, particularly those working on behalf of nation-states. Federal

---

[56] *See* Vesoulis & Berman, *supra* n. 39.

[57] Proposed Wisconsin MOU, *supra* n. 1.

agencies reported over 30,000 security incidents in fiscal year 2022 alone.[58] The threat of such attacks is only growing.[59] Indeed, just in November, the U.S. Congressional Budget Office was breached by hackers.[60] And hackers have a long history of attempting to disrupt and "undermine faith and confidence in" United States elections.[61] Heightening the risks here, DOJ failed to conduct a Privacy Impact Assessment as required by the E-Government Act of 2002 to evaluate privacy and data security risks before collecting the state voter data. *See Weber*, 2026 WL 118807, at *20 (holding that DOJ could not identify an "applicable PIA" and thus "failed its requirements under the E-Government Act).

Whether DOJ is taking sufficient action to prevent its employees and contractors from misusing millions of Americans' voter roll data and PII, and how it is protecting that information from external threats, are important concerns about which the public urgently needs more information.

---

[58] U.S. Gov't Accountability Off., GAO-24-107231, High-Risk Series: Urgent Action Needed to Address Critical Cybersecurity Challenges Facing the Nation 1 (2024), https://tinyurl.com/ycyxzzcf.

[59] *See US warns that hackers using f5 devices to target government networks*, Reuters (Oct. 15, 2025), https://perma.cc/E8E2-ZEGX; *see also* Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early 2024, Report Says*, FedScoop (Oct. 15, 2025), https://perma.cc/6FML-MSPU ("A new report . . . is challenging the idea that federal institutions are more secure than local governments against cybersecurity threats.").

[60] *US Congressional Budget Office hit by cybersecurity incident*, Reuters (Nov. 7, 2025), https://perma.cc/Y64D-JMQN/.

[61] *See, e.g.*, Press Release, DOJ, *Two Iranian Nationals Charged for Cyber-Enabled Disinformation and Threat Campaign Designed to Influence the 2020 U.S. Presidential Election* (Nov. 18, 2021), https://perma.cc/6KNA-XPYS; Ken Dilanian, *Cybersecurity company finds hacker selling info on 186 million U.S. voters*, NBC News (Oct. 21, 2020), https://perma.cc/5WZ8-GYDC.

**III.    The balance of equities and public interest favors granting a preliminary injunction.**

The remaining preliminary injunction factors—balance of equities and the public interest—weigh heavily in CREW's favor. "The public interest is best 'served by the expedited release of the requested documents because it furthers FOIA's core purpose of 'shed[ding] light on an agency's performance of its statutory duties.'" *Protect Democracy Project*, 498 F. Supp. 3d at 144 (quoting *Elec. Privacy Information Ctr.*, 416 F. Supp. 2d at 42). And "[t]his case presents an archetypal FOIA case" because "[t]he requested information has the potential to inform citizens about an issue of the highest national concern"—*i.e.*, whether the federal government is breaking the law and violating millions of Americans' rights by amassing state voter roll information and voters' PII. *Ctr. for Pub. Integrity.*, 411 F. Supp. 3d at 15. "In a functioning democracy, an informed electorate always inures to the public benefit." *Id.* And given the "significant media attention and public debate on the topic of alleged voter fraud" undergirding DOJ's voter data collection efforts, as well as fast approaching elections, "the public interest is particularly well-served by the timely release of the requested documents." *Protect Democracy Project*, 498 F. Supp. 3d at 144.

## CONCLUSION

The Court should enter a preliminary injunction requiring DOJ to expedite processing of CREW's FOIA requests and produce all nonexempt records along with a *Vaughn* index on a rolling basis, processing no fewer than 5,000 pages of potentially responsive records per month. The Court should further order DOJ to prioritize processing and production of the following sub-categories of requested records: (1) records reflecting data sharing agreements with any state or local official or private party regarding state voter data, (2) records reflecting agreements with any private contractor retained to assist DOJ in reviewing state voter data, (3) records relating to DOJ's use of DHS's SAVE system for voter citizenship checks, and (4) privacy or data security

policies and procedures for state voter data containing PII. Finally, the Court should order the parties to submit joint status reports every 30 days, seven days after Defendant's monthly productions are due.

Dated: January 30, 2026                    Respectfully submitted,

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
Kayvan Farchadi (D.C. Bar No. 1672753)
John B. Hill (N.Y. Bar No. 5505508)[+]
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
(202) 408-5565
nsus@citizensforethics.org
kfarchadi@citizensforethics.org
jhill@citizensforethics.org

*Counsel for Plaintiff*

[+]*pro hac vice* pending