**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

   Plaintiff,

  v.

U.S. DEPARTMENT OF JUSTICE,

   Defendant.

</td><td>

Civil Action No. 25-4426 (CKK)

</td></tr>
</table>

**MEMORANDUM OPINION**
(February 19, 2026)

In this Freedom of Information Act ("FOIA") case, Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") seeks information about an allegedly widespread effort to gather sensitive information about vast numbers of registered voters into the hands of a single agency. Specifically, CREW seeks responses to two FOIA requests for records about recent efforts by the U.S. Department of Justice ("DOJ") to obtain and centralize voter information from election officials throughout the country. CREW argues that there is a critical public need for timely access to this information, which is likely to shed light on important matters concerning voter privacy and the separation of powers in the inherently time-limited context of an active election cycle. Accordingly, CREW moves for an order compelling the DOJ to expedite its responses to CREW's FOIA requests. DOJ opposes CREW's motion, arguing that expedited processing is not warranted. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire present

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:
- CREW's Memorandum in Support of Motion for Preliminary Injunction ("Pl.'s Mem."), Dkt. No. 8-1;
- Defendant DOJ's Memorandum in Opposition to the Plaintiff's Motion ("Def.'s Opp'n"), Dkt. No. 12; and
- The Plaintiff's Reply in Support of the Motion for Preliminary Injunction ("Pl.'s Reply"), Dkt. No. 13.

In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court. *See* LCvR 7(f); LCvR 65.1(d).

record, the Court shall **GRANT IN PART** CREW's [8] Motion for a Preliminary Injunction and **ORDER** DOJ to expedite its processing of CREW's FOIA requests.  However, the Court shall **DENY IN PART WITHOUT PREJUDCE** CREW's [8] Motion to the extent that it seeks an order directing DOJ to process its requests at a specific rate.  Instead, the Court shall direct the parties to develop a proposal for expedited processing of categories of potentially responsive records on topics for which there is the most urgent need to inform the public, with rolling productions to begin as soon as practicable.  CREW may renew its request for a specific processing rate upon a showing that DOJ is not producing records in a timely manner and that an order for a specific processing rate is warranted.

## I. BACKGROUND

### A.    Statutory and Regulatory Framework

The Freedom of Information Act ("FOIA") requires federal agencies to release requested records "to the public" unless one of nine statutory exemptions applies.  5 U.S.C. § 552(a), (b). Put simply, the Act protects individuals' "right to be informed about 'what their government is up to.'"  *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989).  Courts construe FOIA's exemptions "narrowly" to reflect the Act's policy of broad disclosure.  *Pavement Coatings Tech. Council v. USGS*, 995 F.3d 1014, 1020 (D.C. Cir. 2021).

When an agency receives a proper FOIA request—that is, a request that follows the agency's procedural rules and "reasonably describes" the records sought—the agency must respond with a "determination" within a specified period.  5 U.S.C. § 552(a)(3)(A), (a)(6)(A)(i).

To make the required "determination," an agency must (1) "gather and review the documents" at issue; (2) "determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents"; and (3) "inform the [requestor] that it can appeal whatever portion of the 'determination' is adverse."  *CREW v. FEC*,

711 F.3d 180, 188 (D.C. Cir. 2013). However, an agency is not required to produce the underlying records at the same time it makes its initial determination. *Id.* Instead, after an agency makes its initial determination, it must "make the records 'promptly available'" to the requestor, which "typically" must be done "within days or a few weeks of a 'determination,' not months or years." *Id.* (quoting 5 U.S.C. § 552(a)(3)(A), (a)(6)(C)(i)).

Usually, the agency's determination is due within 20 business days of receiving a proper request. 5 U.S.C. § 552(a)(6)(A)(i). In "unusual circumstances," the agency may extend the determination deadline by 10 business days if it gives written notice to the requestor explaining why additional time is necessary. *Id.* § 552(a)(6)(B)(i). If the agency exercises this extension, it must "provide the [requestor] an opportunity to limit the scope of the request . . . or an opportunity to arrange with the agency an alternative time frame for processing" either the original request or a "modified" version. *Id.* § 552(a)(6)(B)(ii).

If an agency fails to comply with FOIA's determination deadline, the requestor may immediately seek judicial review without exhausting the agency's internal appeals process. *See* 5 U.S.C. § 552(a)(6)(C)(i); *Am. Oversight*, 414 F. Supp. 3d at 186. Upon such review, a district court may "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B).

Agencies ordinarily process FOIA requests on a "first-in, first-out" basis, meaning that they respond to requests in the order in which they are received. *See* Def.'s Opp'n at 2; Decl. of Mark H. Herrington ("Herrington Decl."), Dkt. No. 12-1, ¶ 17; Decl. of Killian Kagle ("Kagle Decl."), Dkt. No. 12-2, ¶ 11.

However, agencies must provide "expedited processing" of some kinds of FOIA requests. 5 U.S.C. § 552(a)(6)(E). For example, an agency must expedite records processing for a requestor

that is "primarily engaged in disseminating information" if there is "urgency to inform the public concerning actual or alleged Federal Government activity."  *Id.* § 552(a)(6)(E)(v)(II).

Agencies must also promulgate regulations setting criteria for expedited processing under other appropriate circumstances.  *Id.* § 552(a)(6)(E)(i).  As relevant here, DOJ regulations require expedited processing of any FOIA request that involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."  28 C.F.R. § 16.5(e)(1)(iv).  DOJ regulations also echo the statutory requirement for expedited processing for requestors "primarily engaged in disseminating information" when there is "urgency to inform the public" about government activity.  *Id.* § 16.5(e)(1)(ii).

### B.    Factual Background

The following discussion is based on a preliminary record consisting primarily of factual allegations in CREW's Complaint and Motion for Preliminary Injunction that are undisputed and unrebutted.  *See* Compl., Dkt. No. 1, ¶¶ 2–4, 21–36; Pl.'s Mot., Dkt. No. 8, at 4–13.  Many of these allegations are based on public reporting and matters of which the Court may take judicial notice.  *See* Fed. R. Evid. 201(b).  As in all preliminary proceedings, the Court's conclusions are subject to revision as the record develops.

The FOIA requests at issue in this case seek information about a widely reported and allegedly ongoing effort by DOJ to obtain detailed voter information from election officials throughout the country.  CREW alleges that this effort is a response to an Executive Order issued earlier this year, that it has led to data requests and legal action against dozens of States, and that DOJ has begun using the resulting data to check registered voters' citizenship against information in a federal database.  *See* Pl.'s Mem. at 4–13.  Here, the Court summarizes CREW's allegations and the record evidence about the Executive Order and the data-gathering effort at issue.

      1.    <u>Executive Order No. 14,248</u>

Last spring, President Donald J. Trump signed an Executive Order directing federal agencies to take a variety of actions related to the administration of federal elections. *See Preserving and Protecting the Integrity of American Elections*, Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025).

One provision of that Executive Order directs the Secretary of Homeland Security to obtain and review state voter records, "through subpoena where necessary," to compare those records with federal immigration databases and assess "consistency with Federal requirements." *Id.* § 2(b)(iii). The Order also directs the Secretary to share information with the Attorney General and relevant State and local election officials about "all foreign nationals who have indicated on any immigration form that they have registered or voted" in a U.S. election at any level of government. *Id.* § 2(c).

The Order further directs the Attorney General to "take all appropriate action to enter into information-sharing agreements" with State election officials that "aim to provide the Department of Justice with detailed information on all suspected violations of State and Federal election laws discovered by State officials." *Id.* § 5(a). It then directs the Attorney General to "prioritize enforcement of Federal election integrity laws" in States that do not enter into these information-sharing agreements and to consider withholding federal grants from such states. *Id.* § 5(b).

      2.    <u>Recent requests for voter information by the Department of Justice</u>

CREW alleges that, in response to the President's Executive Order, DOJ is attempting to assemble a national voter roll containing voter registration lists from nearly every State and the District of Columbia. *See* Pl.'s Mem. at 6 (citing Kaylie Martinez Ochoa, Eileen O'Conner, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information* ("Brennan Ctr. Tracker"), Brennan Ctr. for Just., https://perma.cc/29UE-9LF4). DOJ is allegedly seeking

"unredacted" voter files from each of these jurisdictions, meaning files that contain not only publicly available information like voters' full names, but also sensitive details like voters' partial Social Security numbers ("SSNs"), complete driver's license numbers, dates of birth, voter participation history, and residential addresses.  *Id.*  (citing Letter from Harmeet K. Dhillon ("Dhillon Letter"), Assistant Att'y Gen., to Shenna Bellows, Me. Sec'y of State (Aug. 18, 2025), https://perma.cc/Z8QQ-3DAR).

According to CREW, this effort is unprecedented, and the voter list DOJ is compiling is "the largest set of national voter roll data it has ever collected."  *See* Pl.'s Mem. at 7 (citing Devlin Barrett and Nick Corasantini, *Trump Administration Quietly Seeks to Build National Voter Roll*, *The New York Times* (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html).

Both the Civil Rights Division and the Criminal Division of the Department have reportedly sent correspondence to State election officials seeking their cooperation with DOJ's effort to collect voter data.  *See* Pl.'s Mem. at 6 (citing Dhillon Letter, https://perma.cc/Z8QQ-3DAR; E-mail from Scott Laragy, Principal Deputy Director, Executive Off. for U.S. Att'ys, and Paul Hayden, Senior Counsel, DOJ Criminal Division, to Stephanie Thomas, Sec'y of State of Conn. (July 10, 2025), https://perma.cc/5ZC9-AD6P; E-mail from Principal Deputy Director Laragy and Senior Counsel Hayden to Gregg Amore, Sec'y of State of R.I. (July 10, 2025), https://perma.cc/3QVN-XCXT).

CREW cites public reporting showing that at least 11 States have already responded to DOJ by either providing their voter lists or stating that they intend to do so.  *See* Pl.'s Mem. at 6 (citing Brennan Ctr. Tracker, https://perma.cc/29UE-9LF4); *see also, e.g.*, Natalia Contreras & Gabby Birenbaum, *Texas hands over complete list of registered voters to Trump administration*,

*The Texas Tribune* (Jan. 9, 2026), https://perma.cc/7TJU-LNGM; Vivian Jones, *TN sends voter data including SSNs to DOJ, and DNC threatens lawsuit*, *Nashville Tennessean* (Jan. 9, 2026), https://perma.cc/2WT5-F7SK.

CREW further notes that many other States and the District of Columbia have declined to provide their voter lists, prompting DOJ to sue in federal court seeking orders to compel their compliance. *See* Pl.'s Mem. at 8 (citing Brennan Ctr. Tracker, https://perma.cc/29UE-9LF4). To date, DOJ has filed at least 25 such actions, asserting that it is entitled to receive State voter lists under the Civil Rights Act of 1960, 52 U.S.C. § 20701 *et seq.*, the National Voter Registration Act, 52 U.S.C. § 20503 *et seq.*, and the Help America Vote Act, 52 U.S.C. § 20901 *et seq.* This litigation is ongoing, but in three early decisions, federal courts in California, Oregon, and Michigan dismissed DOJ's suits for failure to state a claim. *See United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, --- F. Supp. 3d ----, 2026 WL 118807, at *20 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402, at *1 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-cv-1148, --- F Supp. 3d ----, 2026 WL 362789, at *11 (W.D. Mich. Feb. 10, 2026). Two of these courts not only rejected DOJ's statutory argument that it was entitled to receive the data at issue, but also concluded that the Executive Branch's unilateral effort to force States to turn over voter data risked overstepping the constitutional separation of powers. *See Weber*, 2026 WL 118807, at *20; *Oregon*, 2026 WL 318402, at *13.

According to CREW, DOJ has also pursued aggressive tactics outside the courtroom to pressure States into handing over their voter data. For example, CREW alleges that, soon after two separate incidents in which federal immigration agents killed U.S. citizens in Minnesota and amid widespread protests against the federal government's actions in that State, the Attorney General sent Minnesota's Governor a letter urging several actions to "restore the rule of law" and

"bring an end to the chaos in Minnesota." *See* Pl.'s Mem. at 9 (citing Letter from Pamela Bondi, Attorney General of the United States, to Tim Walz, Governor of Minnesota (Jan. 24, 2026), https://perma.cc/KE7Q-5FJJ).  As one such action, the Attorney General urged the Governor to turn over the State's voter rolls to DOJ's Civil Rights Division.  *Id.* at 3.  Election officials in Minnesota and other States have reportedly likened this letter to a ransom demand, interpreting it as a tacit threat to prioritize unrelated federal law enforcement efforts in States that refuse to share voter information with DOJ.  *See* Pl.'s Mem. at 9–10 (citing Matt Cohen, *'All-out assault on our democracy:' Bondi's Minnesota 'blackmail' letter draws righteous fury from state election leaders*, Democracy Docket (Jan. 27, 2026), https://perma.cc/TW8Y-VWJR).

### 3.    Changes to the Systematic Alien Verification for Entitlements Program

CREW alleges that public reporting shows that DOJ is sharing some of the voter data that it receives from States with the Department of Homeland Security ("DHS") to run "citizenship checks" using an online service called the Systematic Alien Verification for Entitlements ("SAVE") Program.  *See* Pl.'s Mem. at 10.

SAVE is an online system that allows agencies at all levels of government to "determine citizenship and immigration status of individuals within their jurisdiction" for lawful purposes, including deciding whether to grant benefits and licenses that require U.S. citizenship or a specific immigration status.  *See DHS/USCIS/PIA-006 Systematic Alien Verification for Entitlements (SAVE) Program*, U.S. Department of Homeland Security, https://perma.cc/8F2V-XBXR.

Over the past year, DHS has overhauled SAVE by eliminating user fees, enabling "mass status checks" for large numbers of individuals, and integrating data from a variety of sources.  *See* Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database*, U.S. Department of Homeland Security (Apr. 22, 2025), https://perma.cc/Y8A5-

YX3M.  The agency has touted the overhauled system's ability to help officials "swiftly verify legal status" to reduce entitlements fraud and voter fraud.  *Id.*

One important detail of DHS's recent overhaul of SAVE is the addition of a search feature that allows agencies to look up individuals' citizenship or immigration status with a widely used identifier like a Social Security number, passport number, or driver's license number.  *See* Department of Homeland Security, Privacy Threshold Analysis for the SAVE Program, at 3–5, https://perma.cc/A44N-4729.  Previously, SAVE only supported searches using a DHS-created identifier like an Alien Registration Number (also called an "A-Number").  *See id.* at 4–5.  Because most people who are U.S. citizens by birth do not have DHS-created identifiers, SAVE could not automatically provide information about most U.S. citizens' status.  *See id.* at 5.  With the recent addition of other kinds of identifiers and data sources, agencies can now use SAVE to "verify" the status of all U.S. citizens.  *Id.*

CREW alleges that, following the recent changes to SAVE, prosecutors from DOJ's Civil Rights Division have asked election officials in at least two States to run their entire voter lists through SAVE.  *See* Pl.'s Mem. at 11 (citing Barrett & Corasantini, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html; Jude Joffe-Block, *A lawsuit tries to block the Trump administration's efforts to merge personal data*, *NPR* (Sept. 30, 2025), https://perma.cc/3TCL-UYGE).  DOJ is also reportedly sharing some voter data directly with DHS for the purpose of running voter lists through SAVE to check individuals' citizenship status.  *See id.* (collecting coverage).

### C.    Procedural History

This case arises from multiple FOIA requests to DOJ in which CREW seeks information about the Department's recent efforts to obtain voter information from States.  CREW submitted the first pair of requests to the Civil Division and the Criminal Division on September 4, 2025.  It

later submitted a related request to the Civil Rights Division on November 4, 2025.  Only the requests to the Criminal Division and the Civil Rights Division are at issue in the pending motion for preliminary relief.  *See* Pl.'s Mot. at 1; Pl.'s Mem. at 14 n.45.

Each of CREW's requests seeks information about "formal or informal data sharing agreements between DOJ and any state or election official providing access to personally identifiable information ('PII')."  *See* Decl. of John B. Hill ("Hill Decl."), Dkt. No. 8-2, ¶¶ 7, 9; Hill Decl. Ex. A ("Sept. 4 Req."), Dkt. No. 8-3 at 2–6, at 1; Hill Decl. Ex. C ("Nov. 4 Req."), Dkt. No. 8-3 at 11–17, at 1.  The requests also seek "formal or informal policies, determinations[,] or conclusions . . . concerning the scope of DOJ's use of the PII it seeks from election officials," including any plans to aggregate or link data from multiple sources.  Hill Decl. ¶¶ 7, 9; Sept. 4. Req. at 2; Nov. 4 Req. at 2.   The November 4 request to the Civil Rights Division also seeks records related to DHS's use of the SAVE Program to verify the citizenship of voters and individuals who are registered to vote.  Hill Decl. ¶ 9; Nov. 4 Req. at 1.

CREW requested expedited processing of each of these requests.  In its requests, CREW asserted that it was entitled to expedited processing for two reasons.

*First*, CREW argued that "there is an 'urgency to inform the public concerning actual or alleged Federal Government activity,'" and that DOJ should therefore grant expedited processing to CREW as an entity that is "'primarily engaged in disseminating information.'"  Sept. 4. Req. at 4 (quoting 5 U.S.C. § 552(a)(6)(E)(v)(II)); Nov. 4. Req. at 4 (same); *see also* 28 C.F.R. § 16.5(e)(ii) (providing for expedited processing under the same circumstances identified in 5 U.S.C. § 552(a)(6)(E)(v)(II)).

*Second*, CREW argued that the Department should process CREW's requests on an expedited basis because the requests involve "[a] matter of widespread and exceptional media

interest in which there exist possible questions about the government's integrity that affect public confidence." Sept. 4. Req. at 4 (quoting 28 C.F.R. § 16.5(e)(iv); Nov. 4. Req. at 5 (same).

On September 16, 2025, DOJ acknowledged CREW's request to the Criminal Division but denied its request for expedited processing. *See* Hill Decl. ¶ 8; Hill Decl. Ex. B ("Sept. 16 Resp."), Dkt. No. 8-3 at 8–9. In its denial letter, DOJ acknowledged CREW's request for expedited processing pursuant to 28 C.F.R. § 16.5(e)(1)(iv), which provides for expedited processing of requests on certain matters of "widespread and exceptional media interest" that may implicate public confidence in government integrity. *Id.* at 1. However, it did not explicitly address CREW's request for expedited processing based on an "urgency to inform the public concerning actual or alleged Federal Government activity." *Compare* Sept. 4. Req. at 4 (quoting 5 U.S.C. § 552(6)(E)(v)(II)), *with* Sept. 16 Resp. at 1 (citing only 28 C.F.R. § 16.5(e)(iv)); *see also* 28 C.F.R. § 16.5(e)(ii).

In response to CREW's November 4 request, which CREW submitted during the lapse in federal appropriations last fall, CREW received the following automated response:

> At present, the government has not been funded. It is uncertain how many days this office will be closed. The FOI/PA Branch will be unable to respond to email nor to telephone messages until funding has been authorized. Please resubmit your FOIA/PA request upon restoration of government appropriations, thank you.

Hill Decl. Ex. D ("Nov. 4 Resp."), Dkt. No. 8-3 at 19; Compl. ¶ 52.

CREW did not resubmit its November 4 request to the Civil Rights Division. *See* Compl. ¶ 53; Hill Decl. ¶ 11; Pl.'s Mem. at 15. More than two months later, on January 13, 2026, the Civil Rights Division acknowledged receipt of CREW's request, with a stated receipt date of December 1, 2025. *See* Kagle Decl. Ex. B. ("Jan. 13 Resp."), Dkt. No. 12-2 at 20–21. The Civil Rights Division's response did not acknowledge CREW's request for expedited processing, and it did not

invoke FOIA's extension provision allowing additional time to respond under "unusual circumstances." *See id.*; *cf.* 5 U.S.C. § 552(a)(6)(B).

CREW filed this action on December 19, 2025, asserting two counts. In Count I, CREW alleges that DOJ wrongfully denied expedited processing of CREW's FOIA requests. Compl. ¶¶ 54–63. In Count II, CREW alleges that DOJ is wrongfully withholding records that are subject to disclosure under FOIA. *Id.* ¶¶ 68.

Six weeks after it filed suit, CREW moved for a preliminary injunction, seeking an order compelling DOJ to expedite processing of its FOIA requests to the Criminal Division and the Civil Rights Division. *See* Pl.'s Mot. at 1; Pl.'s Mem. at 14 n.45, 33–34. DOJ filed a response in opposition to CREW's motion, and CREW replied. *See* Def.'s Opp'n; Pl.'s Reply.

CREW's motion is now ripe for decision.

## II. LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

Preliminary injunctions are especially uncommon in FOIA cases. *See Ctr. for Pub. Integrity v. United States Dep't of Def.*, 411 F. Supp. 3d 5, 7 (D.D.C. 2019) (CKK). There is a good reason for courts to hesitate before granting preliminary relief in this context: Ordering an agency to expedite its production "effectively allows the requestor to jump the queue in front of other [requestors] who have been waiting patiently for the agency's response to their requests, including requests that are subject to expedited processing." *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 184 (D.D.C. 2019) (CRC).

However, courts can and do grant motions for preliminary injunctions in FOIA cases when the moving party makes "the requisite showing" within the traditional four-factor balancing

framework for preliminary equitable relief. *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 7.[2]  Within

that framework, the moving party has the burden of showing (1) that it is "likely to succeed on the

merits," (2) that it is "likely to suffer irreparable harm in the absence of preliminary relief," (3)

"that the balance of equities tips in [its] favor," and (4) that an injunction is in the public interest."

*Winter*, 555 U.S. at 20.  When the Government is the opposing party, as it is in this case, the

balance-of-equities and public-interest factors "merge," and courts address those factors together.

*Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III. ANALYSIS

The "basic purpose" of the Freedom of Information Act is to "ensure an informed

citizenry" and "hold the governors accountable to the governed."  *NLRB. v. Robbins Tire & Rubber*

*Co.*, 437 U.S. 214, 242 (1978).  Given this important purpose, courts routinely recognize that there

is a strong public interest in the expeditious processing of FOIA requests.  *See, e.g.*, *Landmark*

*Legal Found. v. E.P.A.*, 910 F. Supp. 2d 270, 279 (D.D.C. 2012) (RCL); *Elec. Priv. Info. Ctr. v.*

*Dep't of Just.*, 416 F. Supp. 2d 30, 42 (D.D.C. 2006) (HHK).

However, courts considering whether to order expedited processing of FOIA requests must

weigh important countervailing interests, too.  Because agencies have limited resources to process

FOIA requests, requiring an agency to process one request on an expedited basis inevitably delays

the processing of some other requests.  Therefore, "prioritizing all requests would effectively

prioritize none."  *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001).  Meanwhile, requiring

agencies to process requests too quickly could lead to inadvertent disclosures of materials that are

---

[2] *See, e.g.*, *Cleaver v. Kelley*, 427 F. Supp. 80, 82 (D.D.C. 1976) (JLG); *Aguilera v. F.B.I.*, 941 F. Supp. 144, 153 (D.D.C. 1996) (EGS); *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 416 F. Supp. 2d 30, 43 (D.D.C. 2006) (HHK); *Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 76 (D.D.C. 2006) (RMU); *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 188–87 (D.D.C. 2019) (CRC); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32, 39 (D.D.C. 2020) (TFH); *Brennan Ctr. for Just. v. Dep't of Com.*, 498 F. Supp. 3d 87, 103 (D.D.C. 2020) (TJK); *CREW v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 31 (D.D.C. 2025) (CRC), *reconsideration denied,* No. 25-cv-0511, 2025 WL 863947 (D.D.C. Mar. 19, 2025).

exempt from disclosure under FOIA.  *See Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 14 (D.D.C. 2015) (BAH).  Such disclosures can harm legitimate public and private interests in protecting sensitive information from public view.  *See United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010).

After careful consideration, this Court is of the opinion that the FOIA requests at issue in this case are of such importance and urgency that a preliminary injunction requiring expedited processing is warranted.  CREW is likely to succeed on the merits, it faces irreparable harm in the absence of preliminary relief, and the balance of the equities and the public interest weigh in favor of expediting DOJ's responses to the most urgent parts of CREW's request.  However, on the present record, CREW has not shown that it would be in the public interest for the Court to order the specific processing rate that it has requested.  Accordingly, the Court shall **GRANT IN PART** and **DENY IN PART WITHOUT PREJUDICE** CREW's motion for a preliminary injunction.

### A.  CREW is substantially likely to succeed on the merits.

#### 1.    CREW has standing.

The Court begins at the jurisdictional threshold.  The party invoking a district court's jurisdiction always has the burden of showing that there is a "Case" or "Controversy" within the reach of the federal judicial power.  U.S. Const. art. III, § 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  One part of that showing is establishing that the plaintiff has standing—that is, a "personal stake" in the outcome of the proceeding.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (quoting *Raines*, 521 U.S. at 818).

Because federal courts "do not exercise general legal oversight of the Legislative and Executive Branches," a showing that a coordinate Branch is violating the law is insufficient to establish standing.  *TransUnion*, 594 U.S. at 423–24.  A "general legal, moral, ideological, or policy objection to a particular government action" also will not suffice.  *FDA v. All. for*

14

*Hippocratic Med.*, 602 U.S. 367, 381 (2024).  Instead, the party invoking the court's jurisdiction must show "a real controversy with real impact on real persons." *Id.* at 424 (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring in the judgment)).  To do so, it must show that the plaintiff has "suffered an injury in fact that is concrete, particularized, and actual or imminent," that this injury "was likely caused by the defendant," and that it "would likely be redressed by judicial relief." *Id.* at 423.

In this case, as in many FOIA cases, CREW has standing because of a direct injury to its core activities of providing information to the public.  CREW's mission involves enabling and encouraging public participation in government decision-making by "disseminat[ing] information about public officials and their actions," including information obtained through FOIA requests. Compl., Dkt. No. 1, ¶ 8.  In service of that mission, CREW publishes information about topics including voter privacy and federal agencies' data management practices.  *See* Hill Decl. ¶ 12.  As part of that work, CREW intends to disseminate records it receives from the FOIA requests at issue in this case.  *Id.* ¶¶ 13–14.  The alleged denial of statutorily guaranteed access to government records therefore causes a particularized harm to CREW's information-sharing activities and its mission.  *See Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 (D.C. Cir. 2024).

The "downstream consequences" of the alleged FOIA violations on CREW's activities distinguish this case from others in which the plaintiff may lack standing because the "asserted informational injury . . . causes no adverse effects."  *See TransUnion*, 594 U.S. at 442 (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)).  Although the Supreme Court once held that the denial of statutorily required access to information is sufficient on its own to establish standing without any corresponding showing of injury, the D.C. Circuit has acknowledged that more recent precedent sits in tension with that holding.  *Compare Pub.*

*Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989), *with Nat'l Sec. Archive v. CIA*, 104 F.4th at 272 & n.1 (citing *TransUnion*, 594 U.S. at 442).  However, it is undisputed that a plaintiff like CREW has standing if it can show not only a violation of a statutory disclosure obligation but also a "particularized injury" from "some downstream, adverse impact from the agency's nondisclosure."  *See Campaign for Accountability v. U.S. Dep't of Just.*, 155 F.4th 724, 741 (D.C. Cir. 2025) (Rao, J., concurring in the judgment).  Because CREW has made that showing here, this Court clearly has jurisdiction and can proceed to the merits of CREW's claims.

2.    DOJ has not complied with FOIA's statutory determination deadline.

The next prong of the analysis is the most straightforward: It is undisputed that DOJ has not complied with the statutory determination deadline for either of the FOIA requests at issue. *See* Def.'s Opp'n at 15–16.  The Criminal Division acknowledged receipt of CREW's request on September 16, 2025.  *See* Sept. 16 Resp. at 1.  The Civil Rights Division acknowledged on January 13, 2026, that it received CREW's request on December 1, 2025.  *See* Jan. 13 Resp. at 1. Accordingly, the statutory deadline for both components' responses has now lapsed.  *See* 5 U.S.C. § 552(a)(6)(A)(i).  Although DOJ would be entitled to a 10-business-day extension of these deadlines if it provided written notice to CREW of its reason for seeking the extension, there is no indication in the record that it has provided such a notice—and even if it had done so, the extended deadline would now have passed, as well.  *See id.* § 552(a)(6)(B)(i).

DOJ resists the conclusion that CREW is likely to succeed on its FOIA claim based on its failure to meet the statutory determination deadline, but its arguments are unpersuasive.  DOJ correctly notes that agencies miss this deadline for "a vast number of FOIA requests."  Def.'s Opp'n at 15 (quoting *Morley v. CIA*, 894 F.3d 389, 393 (D.C. Cir. 2018)).  But DOJ does not explain how the Government's routine failure to provide timely determinations in FOIA cases alters the analysis of the likelihood that CREW's statutory claim will succeed unless the agency

provides a timely and complete response. FOIA authorizes judicial relief whenever agency records are "improperly withheld" from a requestor. 5 U.S.C. § 552(a)(4)(B). When an agency misses the statutory determination deadline, the requestor is "certain to succeed on the merits of its claim that [the agency] owes it a determination on its requests." *Am. Oversight*, 414 F. Supp. 3d at 186. Accordingly, the fact that agencies routinely withhold records—at least temporarily—by processing requests outside the timeframe provided by statute simply means that many FOIA plaintiffs are likely to succeed in showing that they are entitled to a determination from the agency. The same is true of CREW in this case.

3.   <u>CREW is likely to succeed in showing that it is entitled to expedited processing.</u>

The Court next turns to CREW's request for expedited processing of its FOIA requests. A district court must review an agency's decision about whether to grant expedited processing *de novo*, based on the record that was before the agency at the time of its decision. *Al-Fayed v. C.I.A.*, 254 F.3d 300, 305, 308 (D.C. Cir. 2001).

In this case, DOJ did not explicitly deny each of CREW's requests for expedited processing. The Department did deny one aspect of CREW's request for expedited processing of its request to the Criminal Division, but it did not acknowledge an alternative argument. *See* Sept. 16 Resp. DOJ also did not directly acknowledge CREW's request for expedited processing of its request to the Civil Rights Division. *See* Jan. 13 Resp.

However, DOJ does not dispute that this Court can proceed with *de novo* review as though the agency had expressly denied each of CREW's requests for expedited processing. *See* Def.'s Opp'n at 10. The Court therefore proceeds to review the agency's decisions on that basis.

In its requests, CREW argued that it was entitled to expedited processing for two reasons. First, it argued that expedited processing was warranted due to an "urgency to inform the public"

about government action.  *See* U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(ii).  Second, CREW argued that it should receive expedited processing under DOJ regulations because its request involved "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."  *See* 28 C.F.R. § 16.5(e)(iv).  The Court takes each of these arguments in turn, concluding that each one supports CREW's request for expedited processing.

a.    *Urgency to inform the public*

To be entitled to expedited processing based on "urgency to inform the public concerning actual or alleged Federal Government activity," a requestor like CREW has the burden of establishing both the existence of urgency and that the requestor is "primarily engaged in disseminating information."  5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(ii).

Courts "must consider" at least three factors when deciding whether to grant expedited processing under this provision: "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." *Al-Fayed*, 254 F.3d at 310.

Under these standards, CREW is entitled to expedited processing.

*First*, as other courts in this District have recognized, CREW is "primarily engaged in disseminating information."  *See* Hill Decl. ¶¶ 2–5, 14; *accord CREW v. DOGE*, 769 F. Supp. 3d. at 26–27; *CREW v. U.S. Dep't of Just.,* 820 F. Supp. 2d 39, 45 (D.D.C. 2011) (JEB).  An organization satisfies this standard if sharing information is its "main" activity and not merely "incidental" to other purposes, even if sharing information is not the organization's "sole occupation."  *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298

(D.D.C. 2017) (CRC) (indirectly quoting H.R. Rep. No. 104–795, at 26).  CREW easily meets this requirement.  *See* Compl. ¶ 8; Hill Decl. ¶¶ 2–5, 14.

*Second*, all three factors relevant to expedited processing under the "urgency to inform" provision weigh in favor of expedition.  Given the ongoing election cycle and widespread concern about the alleged federal effort to compile a national voter list at DOJ, that alleged effort is "a matter of current exigency to the American public."  *Al-Fayed*, 254 F.3d at 310.  Because the election cycle is inherently time-limited, delaying a response to CREW's FOIA requests would inevitably compromise the public's interest in understanding the nature of the allegedly ongoing effort before the upcoming elections pass by.  *See id.*; *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

*Third*, and finally, it is undisputed that the requests at issue "concern[] federal government activity."  *See Al-Fayed*, 254 F.3d at 310.

In sum, each of the relevant factors weighs in CREW's favor, and CREW is substantially likely to succeed in showing that it is entitled to expedited processing of its FOIA requests based on "urgency to inform the public concerning actual or alleged Federal Government activity."  *See* 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(ii).

b.    *Matter of exceptional media interest implicating public confidence*

For similar reasons, CREW is entitled to expedited processing because its requests involve "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."  *See* 28 C.F.R. § 16.5(e)(iv).

As CREW's requests to DOJ amply demonstrate, there is "widespread and exceptional" media interest in DOJ's effort to collect voter information from States.  *See id.*; Sept. 4. Req. (collecting coverage); Nov. 4. Req. (same).   Some of the national coverage of this effort that CREW cited in its FOIA requests to DOJ has called into question whether DOJ's actions are

consistent with federal privacy laws and the separation of powers. *See, e.g.*, Patrick Marley & Yvonne Wingett Sanchez, *DOJ hits states with broad requests for voter rolls, election data The Washington Post* (July 16, 2025), https://www.washingtonpost.com/politics/2025/07/16/trump-voter-fraud-elections (cited in Sept. 4 Req. and Nov. 4. Req.); Ali Swenson & Gary Fields, *The Justice Department seeks voter and election information from at least 19 states, AP finds*, *The Associated Press* (Aug. 3, 2025), https://perma.cc/Q9EG-H87H (cited in Sept. 4 Req.). Accordingly, CREW carried its burden of showing "widespread and exceptional media interest" in the subject matter of its requests that implicates "questions about the government's integrity" and may "affect public confidence." *See* 28 C.F.R. § 16.5(e)(iv).  CREW is therefore likely to succeed on the merits of its claim that it is to expedited processing on this basis.

*    *    *

In sum, CREW has shown that it is likely to succeed on the merits of its claim of entitlement to expedited processing, for two reasons.  First, CREW is "primarily engaged in disseminating information," and it is likely to succeed in showing that there is an "urgency to inform the public" about the federal government activity that is the subject of its requests.  *See* 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(ii).  Second, CREW is likely to succeed in showing that its requests involve "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."  *See* 28 C.F.R. § 16.5(e)(iv).

Having concluded that CREW is likely to succeed on the merits of its FOIA claims, the Court turns to the remaining requirements for preliminary relief.

**B.    CREW faces irreparable harm in the absence of an injunction.**

To be entitled to a preliminary injunction, CREW must next show that it faces irreparable harm in the absence of an injunction.  The D.C. Circuit "has set a high standard for irreparable

injury," requiring that the threatened injury be "'both certain and great.'"  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  The threatened injury must also be "beyond remediation."  *Id.*

In "a few rare FOIA cases in this District involving 'ongoing proceedings of national importance,'" courts have recognized that delaying the processing of a FOIA request can cause irreparable harm.  *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 101 (quoting *Ctr. for Public Integrity*, 411 F. Supp. 3d at 11–13); *see also Am. Immigr. Council*, 470 F. Supp. 3d at 38 (finding irreparable harm in case seeking "information that is highly relevant to an ongoing public debate").

This case belongs to that small category.  Because CREW's request relates directly to the conduct of impending elections, CREW faces irreparable harm from any delay in processing its request.  As the D.C. Circuit has recognized, once an election passes, "there can be no do over and no redress."  *Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).  Here, CREW argues persuasively that there is a strong public interest in understanding the details of DOJ's efforts to compile a national voter list, which may affect individuals' and States' decisions about how to protect both voter privacy and the fundamental right to vote.  *See* Pl.'s Mem. at 22–24; *see also* Pl.'s Reply at 15–16.  As an organization "primarily engaged in disseminating information," CREW has a cognizable interest in informing the public about these topics.  *See* 5 U.S.C. § 552(a)(6)(E)(v)(II).  And because "stale information is of little value," especially in the time-sensitive context of an election cycle, CREW's interest in informing the public about these matters will be irreparably impaired by any delay.  *See Brennan Ctr. for Just*, 498 F. Supp. 3d at 101 (quoting *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)).  The irreparable injury resulting from any delay will become

particularly acute after upcoming elections pass, as they will in some States in a matter of weeks. *See* Pl.'s Mem. at 13.

DOJ briefly argues that an injunction is not warranted because both the Criminal Division and the Civil Rights Division "are already processing CREW's requests," but this argument is unpersuasive. *See* Def.'s Opp'n at 13–14. DOJ has not yet committed to releasing responsive records by any fixed date. *Cf.* Harrington Decl. ¶ 19 (stating that DOJ "anticipates" issuing a "first interim response" by April 28, 2026). And by DOJ's own admission, in the absence of an injunction, DOJ will follow its ordinary "first-in, first-out" policy and defer the processing of CREW's FOIA requests in favor of other, earlier-filed requests. *See* Def.'s Opp'n at 15–16; Harrington Decl. ¶ 17; Kagle Decl. 11. Accordingly, the Court concludes that DOJ's efforts to begin processing CREW's FOIA request do not moot CREW's motion or undercut its showing of irreparable harm.

In sum, CREW has carried its burden of showing that it will suffer irreparable harm in the absence of an injunction.

**C.    The balance of the equities and the public interest weigh in favor of granting preliminary relief.**

For the same reason that the threatened harm to CREW is irreparable, the balance of the equities and the public interest favor granting preliminary relief in this case. Because CREW's request seeks information about an allegedly unprecedented change in policy that may directly affect the conduct of impending elections throughout the country, there is an unusually strong public interest in timely disclosure.

The inherently time-limited nature of the election cycle distinguishes this case from others in which courts have denied preliminary relief in FOIA cases. Unlike the requests in these cases, CREW's requests here are unusually urgent because they involve not only a matter of great public

importance, but also a topic that is acutely time sensitive. *Cf. Democracy Forward Found. v. OMB*, 780 F. Supp. 3d 61, 66 (D.D.C. 2025) (SLS) (denying preliminary injunction where requestor sought "information of immense public importance" but had not identified a "sufficiently imminent event" to justify expedited treatment).

DOJ attempts to distinguish the urgency of this case from that of other election-related FOIA cases by arguing that the November 2026 general election is still several months away, but this effort is unpersuasive. Many States affected by DOJ's effort to collect voter data have impending primary elections, with several such elections taking place in less than one month. *See* Pl.'s Mem. at 13 (citing *2026 State Primary Election Dates*, National Conference of State Legislatures https://perma.cc/JA78-GVHD). Other primary elections will take place throughout this year, with the latest elections falling in August and September. *Id.* The information that CREW seeks is therefore urgently relevant right now, and it will remain so throughout the year.

For all these reasons, the balance of the equities and the public interest weigh in CREW's favor and support a preliminary injunction requiring expedited processing of its requests.

### D. Rather than order a specific processing rate, the Court shall direct the parties to meet and confer to narrow and prioritize CREW's requests and propose an expedited schedule for DOJ's productions.

Next, the Court turns to the details of the remedy to be awarded. In its motion for a preliminary injunction, CREW requests that this Court order DOJ to process records at a rate of 5,000 pages of potentially responsive records per month. Pl.'s Mot. at 1; Pl.'s Mem. at 33. That rate would be unusual. Courts in this District routinely approve a more modest processing rate of only 500 pages per month, even in cases with hundreds of thousands of pages of potentially responsive records. *See, e.g.*, *Martinez v. Dep't of Just.*, No. 16-cv-1506, 2023 WL 9781681, at *2 (D.D.C. Sept. 27, 2023) (TJK); *Colbert v. Fed. Bureau of Investigation*, No. 16-cv-1790, 2018 WL 6299966, at *3 (D.D.C. Sept. 3, 2018) (DLF). As DOJ notes, court orders for faster processing

rates can be exceptionally disruptive to an agency's ability to respond to other FOIA requestors. *See* Def.'s Opp'n at 24 (collecting FOIA cases in this District that are stayed until 2027 because of production orders entered in the Northern District of Texas).

In this case, DOJ advises the Court that it processes requests to the Civil Rights Division in increments of 250 pages per month, per request or lawsuit.  Kagle Decl. ¶ 17.  DOJ explains that this rate limit helps the Division maintain "equity amongst the competing interests of numerous requestors" and ensure that it does not inadvertently produce sensitive material that is exempt from disclosure.  *Id.*  DOJ does not identify a standard processing rate for the Criminal Division; however, it states that the Division's small staff assigned to handle FOIA requests could not process records at CREW's requested rate of 5,000 pages per month without "significantly compromising" its ability to respond to other FOIA requestors.  Harrington Decl. ¶ 18.

Upon consideration of the competing interests not only of CREW and DOJ, but also of the other FOIA requestors not before the Court who have requests pending before the Civil Rights Division and the Criminal Division, the Court declines to order a specific processing rate at this stage.  Instead, the Court shall direct the parties to develop a proposal for expedited processing of categories of potentially responsive records on topics for which there is the most urgent need to inform the public, with rolling productions to begin as soon as practicable.  *Accord, e.g.*, *Am. Oversight*, 414 F. Supp. 3d at 187 (directing parties to "meet and confer in an effort to narrow the specific requests so as [to] reduce the number of records that will require accelerated processing").

To ensure that processing and rolling productions proceed expeditiously and that any issues are promptly brought to the Court's attention, the Court shall order the parties to file a joint status report on or before **March 20, 2026,** and to file further joint status reports every 30 days until

CREW's requests are fully resolved. In the parties' initial status report, DOJ shall advise the Court of the date on which it made or will make its first production of responsive records.

### E.    Only a nominal injunction bond is warranted.

Finally, DOJ asks the Court to require CREW to post a bond as a condition of receiving preliminary relief. Def.'s Opp'n at 25–26. The Court will require a nominal bond.

A federal district court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). As a panel of the D.C. Circuit recently clarified, "injunction bonds are generally required" when a court grants preliminary injunctive relief, even in cases in which the public interest clearly favors the injunction and the Government is the opposing party. *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam), *reconsideration en banc denied* (July 16, 2025). However, district courts have "broad discretion" when setting the amount of the required bond. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

Here, the "proper" bond amount is nominal. *See* Fed. R. Civ. P. 65(c). Courts in this District routinely require only nominal bonds from parties obtaining preliminary relief against federal officers and agencies when the awarded relief will not impose an undue monetary burden on the enjoined parties. *See, e.g.*, *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025) (JEB) (requiring bond of $1); *Open Tech. Fund v. Lake*, 788 F. Supp. 3d 32, 39 (D.D.C. 2025) (RCL) (requiring bond of $100). In this case, DOJ has not shown that preliminary relief will cause it any significant costs or injuries apart from the ordinary cost of satisfying its statutory obligations under FOIA. *Cf.* Def.'s Opp'n at 25–26. DOJ can also significantly mitigate the cost of compliance by working with CREW to craft a well-targeted joint proposal for the expedited

processing of the requests at issue.  Because the preliminary relief the Court is awarding will not

unduly burden DOJ, the Court shall require CREW to post a nominal bond of $100.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT IN PART** and **DENY IN PART**

**WITHOUT PREJUDICE** CREW's [8] Motion for a Preliminary Injunction.  An appropriate

Order accompanies this Memorandum Opinion.


**Dated:**  February 19, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge