UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE,

Defendant.

Civil Action No. 25-4426 (CKK)

## JOINT STATUS REPORT

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") and Defendant
the Department of Justice ("DOJ"), collectively "the parties," submit this status report to apprise
the Court of the progress in this action brought under the Freedom of Information Act ("FOIA"),
5 U.S.C. § 552, pursuant to the Court's orders dated February 19, March 24, and April 20.

### Background

CREW brought this action pursuant to FOIA seeking records relating to DOJ's "collection
of confidential voter information and personally identifiable information ("PII")." *See* Compl.
(ECF No. 1) 1. CREW made FOIA requests to three divisions of DOJ: the Civil Division ("CIV")
and the Criminal Division ("CRM") on September 4, 2025; and the Civil Rights Division ("CRT")
on November 4, 2025.

CREW moved for a preliminary injunction on January 30, 2026 (ECF No. 8). On February
19, 2026, this motion was granted in part and denied in part without prejudice (ECF No. 14). The
Court ordered the DOJ to expedite its processing of CREW's FOIA requests as to CRM and CRT,
and to produce nonexempt, responsive records on a rolling basis, accompanied by a *Vaughn* index
if appropriate; ordered the parties to meet and confer in good faith to prioritize among the records

to be processed in response to CREW's FOIA requests and to develop a schedule for expedited processing; and ordered the Parties to begin filing joint status reports (ECF Nos. 14 and 15). CREW provided proposed priority items to DOJ counsel via email on February 23, 2026.

Following the Parties' March 20, 2026, Joint Status Report, this Court issued a Memorandum Opinion and Order (Dkt. 18) on March 24, 2026, granting in part and deferring in part CREW's renewed request for an order directing DOJ to process specific items at a specific rate. DOJ was ordered to process no less than 1,000 pages of potentially responsive records per week and to make an interim production by March 31 and every two weeks thereafter, until further order of the Court. The Parties were further ordered to meet and confer in good faith to resolve or narrow their disagreements on or before March 27, 2026.

The Parties met and conferred on March 26, 2026, where they reached an agreement based on the priority item list that appeared in CREW's section of the previous Joint Status Report (Dkt. 17). The Parties have remained in active communication since then, including meeting and conferring again on April 7, 2026, to discuss possible disputes regarding documents sent for consultation to other agencies or non-CRT components of DOJ.

The FOIA requests and the list of processing priorities that the parties agreed upon at the March 26, 2026, meet and confer may be found at the end of this document as an appendix.

**Defendant DOJ's Statement**

### A. Update on Processing and Compliance with the Court's Order

CREW directed FOIA requests to three components of the DOJ – Civil (CIV), Criminal (CRM), and Civil Rights (CRT). As reported in a previous Joint Status Report (Dkt. 17), a reasonable search determined that CRT is the only component of DOJ that possesses responsive

documents. DOJ's processing and production is being performed exclusively by CRT, although processed documents have been sent to other components for consultation where appropriate.

Through its component CRT, DOJ is complying with the Court's Memorandum Opinion and Order of March 24, 2026 (Dkt. 18) to process at a rate of 1,000 potentially responsive pages per week and making interim productions every two weeks. CRT will continue to do so until further order of the Court or until processing of the FOIA request is complete.

Since the Court's March 24 Order, CRT has made two interim productions to CREW, on March 31 ("Interim Response 2") and April 14 ("Interim Response 3"). Letters accompanying those interim productions included the following tables[1]:

### Interim Response 2 – March 31, 2026

| DESCRIPTION | PAGES |
| --- | --- |
| Documents Processed | 1128 |
| Documents Released in Full | 193 |
| Documents Released in Part | 489 |
| Documents Withheld in Full | 227 |
| Documents Pending Consultation with Another Agency | 219 |

### Interim Response 3 – April 14, 2026

| DESCRIPTION | PAGES |
| --- | --- |
| Documents Processed | 2092 |
| Documents Released in Full | 191 |
| Documents Released in Part | 206 |
| Documents Withheld in Full Pursuant to Exemption(s) | 303 |
| Documents Withheld as Duplicates | 341 |

The remaining processed pages contain equities of one or more other agencies.

---

[1] DOJ notes that CREW contests DOJ's count of its processing totals; see "Plaintiff CREW's Statement" for details. DOJ also notes that these are not running totals, i.e., DOJ's contention is that it processed 1128 pages in the one week between the March 24 Order and Interim Response 2 and then a *further* 2092 pages between Interim Response 2 and Interim Response 3 (for a total of 3,220 pages processed since the March 24 Order as of the April 14 Interim Response 3).

CRT anticipates making its next and final interim production on or before April 28, 2026, at which time CRT anticipates that processing of all potentially responsive documents located by a reasonable search will be complete other than to the extent consultations remain outstanding. Further productions after that date will be made as responsive processed documents are returned from consultation.

### B. Response to Plaintiff CREW's Statement:

> **i.  Any further relief to CREW should come only subsequent to motions or hearings, not status reports.**

As in the previous Joint Status Report, CREW's Statement is in the nature of a motion for specified relief rather than the status update that the Court requested. Defendant maintains that none of the specific relief requested by CREW at the end of its statement below is warranted or consistent with this Court's prior rulings.

Should the Court be inclined to consider any of the relief requested by CREW, Defendant requests that further relief issue only subsequent to motions or hearings, not status reports, to allow Defendant a reasonable opportunity to provide a comprehensive response through opposition.

> **ii.  Defendant has worked exceptionally hard to accommodate Plaintiff in this case; Defendant's good faith efforts should not be weaponized against it, and Defendant should be permitted to complete processing before being subject to new demands from Plaintiff.**

This case has consumed an exceptionally large portion of the FOIA resources of DOJ's component, CRT. Consistent with the Court's March 24 Order (ECF No. 18), as of last Thursday April 16, CRT has processed 3,239 pages – an exceptional and ongoing effort for CRT's small FOIA office, which consists of only 5 attorneys. Beyond this, Defendant has made every effort to confer with Plaintiff in good faith, including holding an additional meet and confer with Plaintiff beyond what was required by the March 24 Order, providing substantive responses to Plaintiff's questions and concerns via email, and providing tables to Plaintiff to track the documents

submitted for consultation by consulting agency or component. None of this was required by the March 24 Order. These good faith gestures are now being used offensively in CREW's Statement, which cites, for example, a DOJ-provided chart of consultations and quotes from DOJ emails in response to CREW's questions.

DOJ notes that this creates a chilling effect, discouraging good-faith efforts by Defendant by creating the risk that action by DOJ to accommodate CREW beyond the text of the March 24 Order may subsequently be used by CREW *against* DOJ. Furthermore, responding to questions from CREW and providing visual aids to help CREW track the status of consultations diverts DOJ resources that are already stretched to meet the Court-ordered rate of processing.

As a result, DOJ respectfully requests that no new relief be granted to CREW at this time based on this Status Report. Instead, DOJ should be allowed to complete processing (which, as stated above, it expects to complete by the next interim production of April 28, 2026 except to the extent consultations remain outstanding).

    **iii.  Consultations, including internal consultations with other components of DOJ, are a normal part of the FOIA process; pending external and internal consultations are immaterial to the question of whether DOJ has met its processing requirements in this case.**

In the course of processing records responsive to FOIA requests, it is not uncommon for an agency to locate records which either originated with another agency, or another component within the agency, or which contain information in which another agency or component has equities. The long-standing practice in such situations is to either refer the requested record to the originating agency or component for it to process, or to consult with the other agency or component that has equity in the document to obtain its input prior to making a disclosure determination. Referrals and consultations are widely utilized and accepted, *see, e.g., Sussman v. U.S. Marshals Service,* 494 F.3d 1106, 1118 (D.C. Cir. 2007).

As courts have recognized, DOJ has a decentralized system for responding to FOIA requests, whereby the DOJ component that receives the request is responsible for responding to it. *See e.g. Watkins Law & Advocacy, PLLC v. United States*, 78 F.4th 436, 445 (D.C. Cir. 2023); 28 C.F.R. §§ 16.1(c), 16.4(a). CREW itself recognized that DOJ processing is performed by individual components, not the Department as a whole, when it directed requests to specific components (CRM, CIV, CRT) and when CREW's preliminary injunction motion only requested "DOJ to expedite processing of CREW's FOIA requests to the Civil Rights Division and Criminal Division" (not, e.g., the Civil Division) (ECF No. 8 at 1).

Although DOJ is the nominal defendant in this action because it is an "agency" within the meaning of FOIA, 5 U.S.C. § 552(f)(1), the real parties in interest are the components that received the requests because they are the entities charged with responding to the requests under DOJ's decentralized processing system. *See Clemente v. FBI,* 867 F.3d 111, 118 (D.C. Cir. 2017) (recognizing the decentralized nature of the FBI's FOIA regulations, and the interests of efficiency promoted by that system, the Court held that the FBI had no obligation to retrieve records from a FBI field office when the FBI's regulations mandated that requests for field office records be directed to the field office, not headquarters). In that context, consultations made by the responding component to another component within DOJ should be viewed no differently than a consultation made by a responding agency. *See* 28 C.F.R. § 16.4(d) ("When reviewing records located by a component in response to a request, the component shall determine whether another component or another agency of the Federal Government is better able to determine whether the record is exempt from disclosure under FOIA"). Consultations are a recognized part of the "processing" of a FOIA request. *See Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180, 189 n.8 (D.C. Cir. 2013) (noting that FOIA itself "acknowledge[s] that some requests may require significant

processing time to search for, collect, examine, and consult about documents before a 'determination' can be made").

Thus, DOJ, through its responsive component CRT, complied with the Court's order of March 24, 2026 requiring the processing of potentially responsive records at a rate of 1,000 pages per week when it sent out a portion of those pages for consultation.  Defendant does not object to further clarification from the Court regarding its March 24 Order. However, consistent with *Watkins* and *Clemente*, *supra*, it maintains that any such clarification should specify that CRT's sending out records for consultations, including internal consultations, is counted towards DOJ's burden to process 1000 pages per week, which DOJ has met and continues to meet through the work of its CRT component.

Furthermore, at this point there is no "net effect" to "significantly impair the requester's ability to obtain the records or significantly to increase the amount of time he must wait to obtain them," per *McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983). Consulting agencies and components have been repeatedly impressed that this matter is subject to expedited processing and a preliminary order; delays of mere weeks in production due to consultations do not require further intervention of this court.

### iv. Concerns regarding the adequacy of search are inappropriate at this time, and should be addressed through a motion for summary judgment after processing and production are completed.

CREW's second issue regarding voter roll data is an objection to the adequacy of the search. Adequacy of search concerns are properly addressed in a motion for summary judgment, where the agency typically defends the adequacy of its search by affidavit or declaration. It is not properly litigated through a status report.

CREW primarily relies on statements made by DOJ in *United States v. Amore*, No. 25-CV-639-MSM (Mar. 26, 2026) to suggest that DOJ's search has not uncovered all responsive

documents. That statement was made in a different case and a different context, and is hardly conclusive evidence that DOJ's search in this context has failed to identify records responsive to CREW's FOIA requests. Nevertheless, DOJ will make internal inquiries to determine if there are potentially responsive records that were missed by the search. If DOJ finds evidence that potentially responsive records were missed, DOJ will conduct supplemental searches to find them.

The most efficient way to conclude this litigation is to allow DOJ to complete its processing of the search it has run. DOJ can then either establish by declaration in the context of a summary judgment motion that its search was adequate or conduct supplemental searches if it determines that a supplemental search is necessary.[2]

### Plaintiff CREW's Statement

The parties have made considerable progress by conferring. And though several disputed issues remain between the parties regarding DOJ's compliance with the Court's March 24 Order, CREW is hopeful the parties can continue to work toward resolution without Court intervention. However, two issues merit the Court's attention at this time. CREW respectfully requests that the Court clarify (1) that DOJ's referral of a record for consultation between DOJ components or to other federal agencies does not fully satisfy its processing obligation under the Court's March 24 Order; and (2) records reflecting any transfer of voter data from any state to CRT are responsive to CREW's FOIA request. These requests are properly made in this joint status report under the Court's February 19 Order, which specifically required that "the parties shall continue to file joint

---

[2]    To be clear, DOJ is *not* conceding that potentially responsive documents were missed; it is saying it will conduct internal inquiries to investigate the question. Furthermore, if the result of those inquiries suggests that supplemental searches are necessary, that would *not* suggest that DOJ's initial search was inadequate; a reasonable and thorough search may nevertheless have missed documents, *see Duenas Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (2003)).

status reports every 30 days advising the Court of the status of the processing of CREW's FOIA requests *and any other matters requiring the Court's attention*." ECF 14 at 2 (emphasis added).

### (1) **DOJ's consultations are causing ongoing delay.**

DOJ is circumventing this Court's March 24 Order to "process" 1,000 pages per week by treating as fully processed thousands of pages that CRT can make no final production, responsiveness, or withholding determination about because those pages are referred for consultation to other DOJ components or other agencies. DOJ's position is especially troubling because many of the initial consultations delaying disclosure were to components of DOJ itself. As the Defendant in this case, DOJ—including its components—is directly subject to the Court's preliminary injunction and expedited processing order, which on their face applied to "DOJ." *See* ECF 18 at 55; ECF 14 at 1. FOIA likewise confirms that it applies to an entire "agency," *i.e.*, "any executive department," and not merely specific agency components. *See* 5 U.S.C. § 552(f). Nothing in the Court's orders or FOIA permit DOJ to indefinitely delay the processing and production of responsive records in its control by engaging in open-ended consultations with its *own* components.

For these pages referred for consultation, DOJ is not just unable to make a determination; DOJ is unable to even represent whether or when those consultations will be complete. Despite negotiating in good faith since April 7, the parties continue to disagree about what constitutes "processing" under the Court's orders and FOIA, as well as the extent to which other agencies that have received actual notice of the Court's preliminary injunction and expediting processing order are bound by them.

In its two interim productions since the March 26 Order, DOJ asserted that records referred for consultation to other DOJ components or other agencies nonetheless have been fully

"processed." DOJ provided the chart below showing, for each of DOJ's March 31 and April 14 processing deadlines, the number of pages that are currently pending consultation with other DOJ components or other government agencies.

Based on this chart, it is CREW's understanding that (1) from DOJ's March 31 processing deadline, 217 pages responsive to CREW's highest priority topics are still pending consultation

| OGA | Interim #2 (31 MAR 2026) | | | Interim #3 (14 APR 2026) | | |
|---|---|---|---|---|---|---|
| | Pages | Status | Notes | Pages | Status | Notes |
| DOJ-CIV | 16 | returned | all pages also pending consult with OGAs | 17 | pending | 13 pages pending consult with OGAs |
| DOJ-CRM | 21 | returned | all pages also pending consult with OGAs | 200 | pending | all pages also pending consult with OGAs |
| DOJ-EOUSA | 0 | n/a | | 111 | pending | all pages also pending consult with OGAs |
| DOJ-JMD | 14 | returned | all pages also pending consult with OGAs | 2 | pending | |
| DOJ-OIP | 189 | pending | 64 pages also pending consult with OGAs | 427 | pending | 267 pages pending consult with OGAs |
| DOJ-OLC | 79 | returned | 4 pages also pending consult with OGAs | 28 | pending | 21 pages pending consult with OGAs |
| DHS-HQ | 13 | pending | all pages also pending consult with OGAs | 92 | pending | 85 pages pending consult with OGAs |
| DHS-ICE | 6 | pending | all pages also pending consult with OGAs | 26 | pending | 14 pages pending consult with OGAs |
| DHS-USCIS | 13 | pending | 2 pages also pending consult with OGAs | 509 | pending | 91 pages pending consult with OGAs |
| SSA | 7 | returned | all pages also pending consult with OGAs | 4 | pending | all pages also pending consult with OGAs |
| WH-EOP | 12 | pending | all pages also pending consult with OGAs | 117 | pending | 70 pages pending consult with OGAs |
| WH-OMB | 2 | pending | all pages also pending consult with OGAs | 20 | pending | all pages also pending consult with OGAs |

within DOJ and/or other agencies, and (2) from DOJ's April 14 processing deadline, 1,051 pages responsive to CREW's highest priority topics are still pending consultation within DOJ and/or other agencies. DOJ has stated it is unable to represent whether or when pages referred for consultation will be produced (even for those documents referred for consultation internally to other DOJ components). But in its email transmitting the chart, DOJ noted that each consulting component or agency has received copies of the FOIA request, Complaint, and PI order.

The Court should reject DOJ's position that "processing" is complete once a single component—CRT—has finished its review of a page but not made a determination, because the page has been referred to another DOJ component or another federal agency for further review before production. For documents referred to another DOJ component, FOIA and the plain terms

of the Court's orders apply to the entirety of "DOJ"—not just the Civil Rights Division—meaning DOJ and *all* its components (including CRT and any other component) were required to process no less than 1,000 pages of potentially responsive records per week. ECF 18 at 5. DOJ's reading is also incompatible with the interests underlying the Court's orders, which recognize that to be effective, expedition is contingent on production. *See* ECF 15 at 1 (finding "an unusually strong public interest in timely *disclosure*"; determining injunction was warranted because "DOJ has not yet committed to *releasing* responsive records by any fixed date"; and committing to setting processing rate if "DOJ is not *producing* records in a timely manner") (emphasis added)); *see also* ECF 18 at 4-5 (court will entertain a motion to modify processing rate "upon a showing that DOJ has produced those responsive records 'for which there is the most urgent need to inform the public'" (emphasis added)). If DOJ can refer documents for consultation within DOJ, it can permanently pass the buck to avoid its obligation to produce its most sensitive documents.

Likewise for documents referred to other agencies, DOJ's position would permit indefinitely delaying production of certain documents, in violation of the Court's orders and FOIA itself. Although FOIA contemplates that in "unusual circumstances" agencies may consult "with another *agency*" (not another *component*) to process a FOIA request, the statute imposes procedural prerequisites for using unusual circumstances to extend deadlines—providing timely written notice—and nothing in the provision creates a separate consultation purgatory that allows agencies to keep records in limbo indefinitely once referred for consultation. *See* 5 U.S.C. § 552(a)(6)(B)(i) (emphasis added). Rather, FOIA contemplates that in such unusual circumstances, consultation is a component of processing. *See id.* § 552(a)(6)(B)(iii) (defining "unusual circumstances" to include "the need for consultation," "which shall be conducted with *all practicable speed*" and "only to the extent reasonably necessary *to the proper processing of the*

*particular requests*." (emphasis added)). Referral is thus a step that must be completed quickly and *before* processing is complete. And of course, even in unusual circumstances, the agency in receipt of the FOIA request remains responsible for making "records promptly available," *id.* § 552(a)(3), and complying with FOIA's statutory deadlines.[3] DOJ is not permitted to indefinitely delay disclosure, while simultaneously claiming compliance with this Court's March 26 Order ordering processing of 1,000 pages per week, by referring records out for open ended consultations and claiming it has completed processing.

In response to similar production delays by DOJ, where the agency claimed that it had processed records but had indefinitely delayed production citing consultations within the agency, a court in this District issued a processing order defining "to process" as "meaning produce, deem unresponsive, or determine that an exemption applies to" a record. *See* Minute Order, *Democracy Forward Foundation v. DOJ*, 1:25-cv-01210-AHA (Apr. 7, 2026 D.D.C.). The court further clarified that "[t]o the extent Defendant needs further internal consultation to determine whether records are responsive or an exemption applies, such records shall not count toward the production rate." *Id*. The Court should follow suit here.

DOJ's position that once other agencies are reviewing pages they are outside the scope of the Court's injunction is also inconsistent with the Federal Rules of Civil Procedure. Rule 65 states that preliminary injunctions bind "other persons who are in active concert or participation with" the defendant, so long as the other persons have actual notice of the injunction order. Fed. R. Civ.

---

[3] In certain cases, for example if a document originated with a different agency, an agency may fully refer a FOIA request or certain records to a different agency for processing as long as the "net effect is significantly to impair the requester's ability to obtain the records or significantly to increase the amount of time he must wait to obtain them." *McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983). Counsel in this case, however, has conferred that DOJ has not fully referred any records to a separate agency, and DOJ remains responsible for fulfilling the requests at issue

P. 65(d)(2)(c). Here, all of the components and agencies with whom DOJ is consulting are "other persons in active concert or participation with" DOJ, since they have notice of the injunction and are assisting in processing. Thus, even though they are not named defendants, the Court's injunction applies to all consulting agencies. At most, then, other agencies outside DOJ are bound by the same terms as DOJ and must "process[] no less than 1,000 pages of potentially responsive records per week." ECF 18 at 5.

Finally, these delays in processing are significant and likely resulting in withholding some of the documents that CREW and the public most urgently needs. On March 31, DOJ informed CREW that "[t]he Civil Rights Division has completed processing priorities A and B." Priority B is "[a]ll records relating to DOJ's use of the Department of Homeland Security's Systematic Alien Verification for Entitlements ("SAVE") system for purposes of verifying the citizenship of voters or voter registrants in any state." App. I. But DOJ has not produced any agreement between DOJ and DHS concerning DOJ using SAVE. The absence of a DOJ/DHS SAVE agreement is directly contrary to CNN reporting that "[t]he Justice Department has finalized a deal with the Department of Homeland Security to give DHS sensitive voter-roll data the administration has demanded from states to be checked against a citizenship verification program that has been criticized for its inaccuracies"[4] and counsel from CRT stating in a recent federal court hearing that "we are certainly going to be proceeding with running this, our intention is to run this [state's voter roll] against DHS's SAVE database."[5] Presumably, the reason DOJ has not produced its agreement with DHS

---

[4] Gabe Cohen, Tierney Sneed, Jeremy Herb, and Fredrela Schouten, *Trump is trying to build a massive voter database. Election officials are afraid of what he'll do with it*, CNN (April 5, 2026), https://archive.ph/e0bZM#selection-2787.7-2798.0.

[5] Hr'g Tr. at 50:22-23, *United States v. Amore*, No. 25-cv-639 (D.R.I. Mar. 26, 2026); *see also* Letter from Kris Warner, Sec'y of State of West Virginia, to Eric Neff, Acting Chief of the Civil Rights Division Voting Section at DOJ (Feb. 11, 2026), https://perma.cc/DCA2-U5Q2 ("Based on recent verbal communications with your office, the alleged purpose of the DOJ's request is to

to access SAVE is because it includes pages that have been referred to another agency (likely DHS-USCIS, as reflected on the above chart). But given copious reporting about the unreliability of SAVE, CREW and the public need to know whether DOJ is using that system.

CREW respectfully asks the Court to clarify that fully processing a record in compliance with its March 26 Order requires the DOJ—not just CRT—to determine responsiveness, determine the applicability of any exemptions, and produce all non-exempt portions, and that documents that have been referred are not fully processed. Or, in the alternative, because each consulting agency has received actual notice of the Court's preliminary injunction order, CREW requests that the Court order any consulting division or agency that it is required to conduct consultation at the same rate that DOJ is required to process documents, as the Court's preliminary injunction binds all consulting divisions and agencies under Fed. R. Civ. P. 65(d)(2)(C).

**(2) <u>DOJ fails explain how transfers of voter roll data created no records.</u>**

Although DOJ has represented to CREW that it has completed processing priorities two of CREW's highest priority items, DOJ's productions omit entire categories of records that fall squarely within CREW's requests when liberally construed, as FOIA and this Court's March 24 Order require.

CREW's highest priority item is "[a]ll final formal or informal agreements with states relating to voter data or verifying voter citizenship." Appendix II. DOJ's productions to date confirm that it received voter registration data from numerous states beyond Alaska and Texas, the only states for which DOJ produced formal memoranda of understanding. For an additional nine states, CREW has identified what it considers informal data-sharing agreements, in the form of

---

run West Virginia entire voter list through the Systematic Alien Verification for Entitlements ("SAVE") database[.]").

letters and emails agreeing to transfer voter data to DOJ, sometimes subject to specific conditions. However, the records DOJ produced to date also reference other states which have agreed to or have in fact transmitted voter roll data to DOJ—including, Mississippi, Arkansas, Kansas, South Dakota, Missouri, Kentucky, and Tennessee. Yet, DOJ has not produced formal or informal agreements with any of these states. Moreover, DOJ has represented to other federal courts that it received complete, unredacted statewide voter registration lists from at least 17 states. *See* Hr'g Tr. at 49:11–12, *United States v. Amore*, No. 25-cv-639 (D.R.I. Mar. 26, 2026); ("So we kept all the lists that we received—at this point it's been 17 states . . ."). Accounting for the 11 states for which DOJ has produced some form of formal or informal agreement to date, at least six additional states appear to have transmitted voter roll data to DOJ without any corresponding agreement.

In response to CREW's inquiry about these gaps, DOJ takes the troubling position that "the fact that CRT obtained a list" from a state "does not necessarily mean there is a record (e.g., an email) reflecting that." In CREW's view, any transfer is itself a record, because data must be transferred using some medium (via email, file transfer, letter, etc.). DOJ's suggestion that it may have received millions of voter records from multiple states without generating or possessing anything reflecting that transfer raises serious concerns about the nature of its search and its compliance with its record keeping obligations. Under FOIA, an agency must conduct a search "reasonably calculated to uncover all relevant documents." *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). DOJ's productions to date demonstrate that the transfer of voter data from other states *did* generate records—for example, emails coordinating transmission, references to MOUs, confirmations of receipt, and upload logs. If similar records exist for the states identified above, DOJ has failed to locate or produce them. If no such records exist—meaning DOJ received millions of Americans' sensitive voter data from these states with

no written record whatsoever—DOJ should be required to confirm this fact as agencies regularly do in the normal processing of FOIA requests, and explain to the Court how such a transfer could have occurred without creating a record.

*          *          *

For the foregoing reasons, CREW respectfully requests this Court issue an order (1) clarifying that DOJ's referral of a record for consultation between DOJ components or to other federal agencies does not fully satisfy its processing obligation under the Court's March 24 Order and that such consulting components or agencies must process pages at the same speed as DOJ; (2) directing DOJ to determine the responsiveness of and the applicability of any exemptions to 1,000 pages per week and produce all non-exempt portions of these conferral records on a rolling basis to CREW; (3) clarifying that any transmission of voter roll data from any state to DOJ is responsive to CREW's priority item seeking "[a]ll final formal or informal agreements with states relating to voter data or verifying voter citizenship," s*ee* Appendix II; and (4) directing DOJ to conduct a supplemental search for all records reflecting the transmission of voter data from any state, including but not limited to Arkansas, Kansas, Kentucky, Mississippi, Missouri, South Dakota, and Tennessee, and to the extent no formal or informal agreements exist, affirmatively confirm that fact in its next interim production.

**<u>Conclusion</u>**

DOJ proposes that the parties submit a further status report to the Court within 30 days, or by May 20, 2026. CREW proposes that the parties submit a further status report to the Court within 14 days, or by May 6, 2026.

Dated:  April 22, 2026

Respectfully submitted,

/s/ *Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
Kayvan Farchadi (D.C. Bar No. 1672753)
John B. Hill (N.Y. Bar No. 5505508)*
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
(202) 408-5565
nsus@citizensforethics.org
kfarchadi@citizensforethics.org
jhill@citizensforethics.org

*Counsel for Plaintiff*

*admitted *pro hac vice*

JEANINE FERRIS PIRRO
United States Attorney

By: /s/ *Samuel G. Settle*
    SAMUEL G. SETTLE
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-7705

*Attorneys for the United States of America*

**<u>Appendix: FOIA Requests and the Priority of Processing</u>**

**I. CRT FOIA Request (November 4, 2025) (ECF No. 1-5):**
1. All formal or informal data sharing agreements between DOJ and any state or election official providing access to personally identifiable information ("PII").
2. All records relating to DOJ's use of the Department of Homeland Security's Systematic Alien Verification for Entitlements ("SAVE") system for purposes of verifying the citizenship of voters or voter registrants in any state.
3. Agency records sufficient to show:
   a. All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning the scope of DOJ's use of the PII it seeks from election officials. This includes records reflecting any plans for how the agency will compile, aggregate, synthesize, match, link, or otherwise combine data obtained from an election official with any other data.
   b. Privacy or data security safeguards in place for protecting PII shared by election officials.

**II. Processing Priority (Agreed Upon by the Parties During a Meet and Confer on March 26, 2026):**
A. "All final formal or informal agreements with states relating to voter data or verifying voter citizenship."
B. "All final formal or informal agreements with . . . DHS relating to . . . the Systematic Alien Verification for Entitlements (SAVE) system."
C. "All final formal or informal policies, procedures, analyses, determinations or conclusions (including underlying memoranda) relating to DOJ's use of [the PII it seeks from election officials]."
D. "All final formal or informal policies, procedures, analyses, determinations or conclusions (including underlying memoranda) relating to DOJ's use of SAVE."[6]

---

[6] CREW has reserved the right to prioritize items beneath the D category, once DOJ has concluded processing and producing all documents responsive to priorities A-D.